## STATE OF CONNECTICUT *v.* MARK ALLEN
## (13729)

PETERS, C. J., SHEA, GLASS, COVELLO and BORDEN, Js.

Argued June 6—decision released August 21, 1990

*Temmy Ann Pieszak,* assistant public defender, with whom, on the brief, were *G. Douglas Nash,* public defender, and *Ashley Wille,* law student intern, for the appellant (defendant).

*Harry Weller,* assistant state's attorney, with whom, on the brief, was *Michael Dearington,* state's attorney, for the appellee (state).

GLASS, J. The defendant, Mark Allen, was charged with the crimes of felony murder in violation of General Statutes § 53a-54c, burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), and robbery in the first degree in violation of General Statutes § 53a-134 (a) (1).[1] After a jury trial, the defendant

---

[1] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit

was found guilty of all charges, and on May 19, 1989, was sentenced to a total effective sentence of forty years. He appeals the judgment of conviction.

On appeal, the defendant argues: (1) that the trial court should have excused a juror who recognized the victim's former wife; (2) that the court did not adequately explain the element of "remaining unlawfully" for the offenses of burglary in the first degree and felony murder with burglary as its predicate felony; (3) that the court should have required the prosecution to prove beyond a reasonable doubt that the defendant "entered or remained unlawfully" on the premises as required to support the charges of burglary in the first degree and the alternative form of felony murder based on burglary as the underlying felony; (4) that the court improperly instructed the jury on the requirements of felony murder by (a) including accessory liability under General Statutes § 53a-8[2] in its instructions on felony murder, and (b) refusing to instruct in accordance with

---

the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

"[General Statutes] Sec. 53a-101. BURGLARY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and  . . .  (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

"[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime  . . . ."

[2] "[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intention-

the defendant's requests to charge numbered eight and nine regarding the limits of liability and the "in furtherance" requirement of the charge of felony murder; and (5) that the court should not have instructed the jury on an unsupported theory of liability for the charges of robbery in the first degree and felony murder with robbery as its predicate felony. We affirm the judgment of the trial court.

The following evidence was presented at trial. In July, 1987, the victim, Theodore G, lived at a condominium complex in Branford. He owned a 1985 navy blue Chevrolet Celebrity. He was divorced from his wife, and lived alone. The victim engaged in homosexual activity, and he and David Mooney, who had a history of "hustling" homosexual men, were at some point involved in a relationship. On occasion, Mooney and the victim had been observed together outside Partners, a gay club in New Haven, as well as at the victim's place of employment and his condominium.

The victim was last seen alive between 6:30 and 7 p.m. on Wednesday, July 29, 1987, by a security guard who was working at a beach near the victim's condominium. Family members of the victim entered his condominium at approximately 9:30 a.m. on Friday, July 31, 1987. The family members found the front door unlocked and no signs of forced entry, and nothing appeared out of the ordinary on the first floor. They then discovered the victim's naked body on the floor in the master bedroom upstairs. In reporting their observations to the police, the family also stated that the victim's automobile was missing, and that a large amount of coins, which the victim had accumulated, was also missing.

ally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

On August 5, 1987, the Branford and New Haven police observed the defendant driving a blue car matching the description of the victim's car, but bearing a different registration plate. Upon questioning, the defendant stated that the car belonged to his brother who had rented it. The police, however, determined that the vehicle belonged to the victim, and the defendant was then arrested. At trial, the state introduced four taped statements given by the defendant to the police during the course of the evening and early morning of his arrest. These statements were given at 9:37 p.m., 12:20 a.m., 3:40 a.m. and 4:40 a.m.

The defendant first stated that Mooney, his accomplice, had owed him $3200 for some drugs. Specifically, the defendant explained that on the afternoon of July 30, 1987, Mooney had offered him a bank bag full of rolled quarters, and that he and Mooney had changed the quarters into bills at a check cashing facility, where Mooney had given him $240 in cash from the quarters. Later that evening, Mooney told the defendant that he would give him a television to pay off more of the debt. When the defendant met Mooney the next day to receive the television, Mooney did not have it, but he offered the defendant the blue car as collateral. He also told the defendant that he did have a television for him and, with the defendant driving the blue car, they left to get the television. While the defendant drove, Mooney tried to open a metal box that he thought might contain money. When he saw that it contained only papers, Mooney threw the box in a dumpster at Kensington Square, and ran away, leaving the defendant with the car.

In his second statement, the defendant added that Mooney told him that he had made a "score," that he had somebody he called "Theo" tied up, and that that was how he had gotten the coins. The defendant stated

that Mooney told him that the television that he had planned to give the defendant was from Theo's house. The defendant also stated that he had helped Mooney sell a VCR to a person named Eric Daniels.

In his third statement, the defendant admitted that he actually drove Mooney to the victim's condominium in the victim's car on the evening of July 30, 1987. The defendant claimed that Mooney had explained to him that he used to date the owner of the condominium. When they arrived at the condominium, the victim was upstairs in the master bedroom, naked, tied up and gagged. The defendant stated that he and Mooney took a VCR, some coins and a box from upstairs. As Mooney went through closets and drawers in both bedrooms, the defendant stated that the victim was "looking to me like help me." The defendant said that he had not touched the victim, but that Mooney had "smacked him." Mooney also told the victim to shut up or he would kill him. The defendant stated, however, that the victim had been alive when he left the condominium, and that Mooney never told him that he had killed the victim, although he did say that he was coming back to the condominium to party.

In his fourth statement, the defendant stated that he had taken the VCR when he and Mooney entered the condominium. They then went upstairs where the victim was tied up and making a lot of noise. The defendant stated that Mooney said that he had to shut the victim up. Mooney then began choking him with a cord and the defendant watched for two to five seconds. The defendant stated that he did not know if Mooney untied the victim after he finished choking him because he left the condominium and went outside to sit in the car. After a while, he went back to the door of the condominium and told Mooney to come on. When Mooney came down, he had fresh bleeding scratches

on his back. Mooney took off his shirt, threw it into a bedroom and put on a blue shirt. The defendant stated that Mooney said that the victim would not stop scratching him, and that the victim had passed out.

The next morning the defendant also told the police that, if they looked in the woods behind the International House of Pancakes parking lot in Hamden, they would find the registration plate of the victim's car and a pair of bloody pants. The defendant also assisted the police in recovering the VCR from Daniels. Additionally, the prosecution introduced the testimony of another incarcerated prisoner, who testified that, while he was in a holding cell with the defendant, the defendant told him that he had strangled the victim to death when the victim had entered the condominium and caught him and Mooney stealing items.

At trial, the defendant testified that he had driven Mooney to the victim's condominium to get a television to repay part of the money that Mooney had owed him for the drugs. He saw a VCR downstairs and, since the television was old, he decided to take the VCR instead. He then joined Mooney upstairs, and saw the victim on the bed, naked and loosely tied while Mooney was poking him in a playful manner. He testified that he knew that Mooney had a sexual relationship with the victim, and, not wanting to get involved in that type of activity, he left. The defendant then picked up the VCR, left the condominium, and waited for Mooney in the car. Mooney came out in about fifteen minutes, and they both drove away. The defendant also presented testimony from the victim's former wife. She testified that the victim had been engaged in homosexual activity since the early 1970s.

## I

The defendant claims that the trial court should have granted his request to excuse a juror for cause when

the juror acknowledged that she recognized the victim's former wife, who ultimately became a witness for the defense. Moreover, the defendant argues that the court should not have concluded that, absent disqualification for cause, it lacked the authority to excuse the juror and substitute an alternate. The following additional facts serve as the basis for this claim.

On the second day of trial, the clerk informed the court that a juror had indicated to him that on the first day of trial she believed that she recognized someone who was seated in the courtroom "and inquired as to whether or not that person was the former wife of the victim . . . ." The court, with counsel in agreement, conducted a voir dire of the juror that revealed that she and the woman she recognized worked in the same building. The juror stated: "In the morning, as I go in, sometimes she is going up with me and I say 'good morning and how are you.' That is all. I don't know her name or who she is." The juror was, at that time, unaware of any connection between the woman she recognized and the case, but assumed that she might be a member of the victim's family. The court then asked the following questions to determine whether her recognition of this woman would adversely affect her ability to serve on the jury:

"The Court: You have made some sort of an assumption that she was someone connected with the family?

"Juror: I would imagine.

"The Court: Be that as it may, would that, in any way, affect your ability to leave sympathy out of the case?

"Juror: No.

"The Court: It would not affect you at all?

"Juror: No.

"The Court: In other words, you would still be able to function as a juror?

"Juror: Yes.

"The Court: All right. It is not necessary if you know who that person is or is not, and that person may be in this courtroom during the course of the trial, would you be uncomfortable in any way or feel a little concerned about the fact that if you should make a ruling in this matter or make a determination in this matter, that you think might be contrary to the way she would want you to do it, that might cause you some concern when you go back to work?

"Juror: I don't think so.

"The Court: All right. Have you discussed this situation with the other jurors?

"Juror: No.

"The Court: You have not?

"Juror: No.

"The Court: Fine. Counsel want to ask any questions?

"[State's Attorney]: No, your Honor.

"[Defense Counsel]: No, Judge."

Defense counsel, however, expressing concern about possible contact between the juror and the victim's former wife after the completion of the case, then requested that the court excuse the juror. He also asserted that if he had known at voir dire the information disclosed by the inquiry, he would have peremptorily excused the juror.[3] The court stated that it did

---

[3] The defendant also maintains that, under the circumstances of this case, where the cause for concern regarding the juror was not known during voir dire, he should have been permitted to exercise his remaining peremp-

not disagree with defense counsel's representation that he would have excused the juror had the information elicited by the court's inquiry been known at voir dire. Nonetheless, the court determined that, if the information elicited during the inquiry had been disclosed to the court at voir dire, the court would not have excused the juror for cause. The court stated further that once the jury is selected the only reason the court would excuse a juror would be for cause and, since the court could not find cause to excuse this juror, the court therefore denied defense counsel's request. The defendant contends that the trial court improperly denied his request. We disagree.

The state argues, and the defendant concedes, that the defendant's claim that the trial court improperly concluded that, absent disqualification for cause, it lacked the authority to excuse the juror is unpreserved. The claim, therefore, would not ordinarily be reviewable. It requires no elaboration, however, to recognize that it is settled law under the federal and state constitutions that the right to an "impartial jury" is a fundamental constitutional right and is one of the exceptions recognized in *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), and *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[4] Accordingly, because of the particular factual

tory challenge once the information had come to light. We know of no authority for the revival at trial of peremptory challenges and therefore reject this argument.

[4] The sixth amendment to the United States constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . . " This guaranty has been made applicable to the states by incorporation into the fourteenth amendment. See *Duncan* v. *Louisiana,* 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491, reh. denied, 392 U.S. 947, 88 S. Ct. 2270, 20 L. Ed. 2d 1412 (1968). The constitution of Connecticut, article first, § 8, provides in pertinent part: "In all criminal prosecutions, the accused shall have a right . . . to a speedy, public trial by an impartial jury."

basis of this claim, and its potential impact on the defendant's right to an impartial jury, we will review the claim.

" ' "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin* v. *Dowd,* 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961).' *State* v. *Ziel,* 197 Conn. 60, 64, 495 A.2d 1050 (1985); see *Murphy* v. *Florida,* 421 U.S. 794, 799, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975); *State* v. *Brigandi,* 186 Conn. 521, 542, 442 A.2d 927 (1982). ' "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the [c]onstitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." ' *Irvin* v. *Dowd,* supra, 724–25, quoting *United States* v. *Wood,* 299 U.S. 123, 145–46, 57 S. Ct. 177, 81 L. Ed. 78 (1936). The trial court is vested with wide discretion in determining the competency of jurors to serve, and that judgment will not be disturbed absent a showing of an abuse of discretion. *United States* v. *Tegzes,* 715 F.2d 505, 509 (11th Cir. 1983); *United States* v. *Carlin,* 698 F.2d 1133, 1135 (11th Cir.), reh. denied, 705 F.2d 471, cert. denied, 461 U.S. 958, 103 S. Ct. 2431, 77 L. Ed. 2d 1317 (1983); *United States* v. *Sears,* 663 F.2d 896, 900 (9th Cir. 1981), cert. denied sub nom. *Werner* v. *United States,* 455 U.S. 1027, 102 S. Ct. 1731, 72 L. Ed. 2d 148 (1982); *State* v. *Ziel,* supra. In exercising this discretion the trial court must zealously protect the rights of the accused. *Wainwright* v. *Witt,* 469 U.S. 412, 429–30, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)." *State* v. *Cubano,* 203 Conn. 81, 88–89, 523 A.2d 495 (1987). This court has stated, however, that " ' "[t]o succeed on a claim of bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact." *State* v. *Almeda,* 189 Conn. 303, 313, 455 A.2d

1326 (1983); *State* v. *Bowen,* 167 Conn. 526, 532, 356 A.2d 162 (1975).' *State* v. *Ziel,* supra, 65; see also *Dennis* v. *United States,* 339 U.S. 162, 168, 70 S. Ct. 519, 94 L. Ed. 734, reh. denied, 339 U.S. 950, 70 S. Ct. 799, 94 L. Ed. 1364 (1950)." *State* v. *Cubano,* supra, 89. "In challenging the competency of [a] juror to remain on the panel it [is] the defendant's burden to prove actual bias on behalf of the juror. See *State* v. *Ziel,* supra; *State* v. *Bowen,* supra, 532." *State* v. *Cubano,* supra, 90.

The defendant claims that the trial court should not have concluded that it could only have excused the juror for cause. Specifically, the defendant argues that General Statutes § 54-82h (c) mandates that the trial court could have excused the juror absent cause. We disagree. Section 54-82h (c) states, in pertinent part, "[i]f, at any time, any juror shall, for any reason, become unable to perform his duty, the court may excuse him . . . ." Thus, § 54-82h (c) expressly premises the trial court's power to excuse a juror on its finding that the juror had "become unable to perform his duty." This is a finding of cause. Thus, the trial court correctly concluded that it could have excused the juror only upon a finding of cause.

As for the merits of the defendant's claim concerning the trial court's refusal to excuse the juror, defense counsel's expressed concern was about the juror's contact with the victim's former wife after the completion of the case. The following facts, however, indicate that the defendant has not met his burden of proving bias on behalf of the juror and abuse of discretion on the part of the trial court regarding its conclusion that the juror was still able to perform her duty: (1) the juror did not know the former wife; (2) the juror's only contact with the former wife was an occasional encounter as they entered the same building in the morning; and

(3) the juror maintained to the trial court that she could remain impartial and still function as a juror. In addition, the fact that the former wife became a defense witness who testified as to the victim's homosexual activity does not alter this conclusion. The defense called the former wife to the stand; thus, if anything, an argument can be made that the former wife was called in support of the defendant. Accordingly, we find no merit to the defendant's claim.

## II

The defendant next claims that the trial court did not adequately explain in its charge the element of "remaining unlawfully" pursuant to General Statutes § 53a-100 (b)[5] for the offenses of burglary in the first degree and felony murder with burglary as its predicate felony. The defendant also challenges the sufficiency of the state's evidence regarding the element of "entering or remaining unlawfully." See General Statutes § 53a-100 (b). We first consider the defendant's sufficiency of the evidence claim.

## A

For the state to prove burglary it must establish that the defendant "entered or remained unlawfully" in the

---

[5] "[General Statutes] Sec. 53a-100. DEFINITIONS. (a) The following definitions are applicable to this part: (1) 'Building' in addition to its ordinary meaning, includes any watercraft, aircraft, trailer, sleeping car, railroad car, other structure or vehicle or any building with a valid certificate of occupancy. Where a building consists of separate units, such as, but not limited to separate apartments, offices or rented rooms, any unit not occupied by the actor is, in addition to being a part of such building, a separate building; (2) 'dwelling' means a building which is usually occupied by a person lodging therein at night, whether or not a person is actually present; (3) 'night' means the period between thirty minutes after sunset and thirty minutes before sunrise.

"(b) The following definition is applicable to sections 53a-101 to 53a-106, inclusive: A person 'enters or remains unlawfully' in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so."

victim's home. " 'A person "enters or remains unlaw-
fully" in or upon premises when the premises, at the
time of such entry or remaining, are not open to the
public and when the actor is not otherwise licensed or
privileged to do so.' (Emphasis [omitted].) General Stat-
utes § 53a-100 (b). . . . 'A *license* in real property is
defined as a personal, revocable, and unassignable *priv-
ilege,* conferred either by writing or parol, to do one
or more acts on land without possessing any interest
therein.' (Emphasis added.) 25 Am. Jur. 2d, Easements
and Licenses § 123. Generally, a license to enter prem-
ises is revocable at any time by the licensor. Id., § 128.
It is exercisable only *within the scope of the consent
given.* [Emphasis added.] *Miller* v. *Grossman Shoes,
Inc.,* [186 Conn. 229, 237, 440 A.2d 302 (1982)]. . . .
The phrase, 'licensed or privileged,' as used in General
Statutes § 53a-100 (b) is meant as a unitary phrase,
rather than as a reference to two separate concepts."
*State* v. *Grant,* 6 Conn. App. 24, 29–30, 502 A.2d 945
(1986).

The defendant argues that the state failed to prove
beyond a reasonable doubt that he entered or remained
in the victim's condominium without license or privi-
lege to do so. " 'Appellate analysis of a claim of insuffi-
ciency of the evidence requires us to undertake a
twofold task: We must first review the evidence con-
struing it in the light most favorable to sustaining the
trial court's verdict. *State* v. *Williams,* 205 Conn. 456,
468, 534 A.2d 230 (1987); *State* v. *Vincent,* 194 Conn.
198, 206, 479 A.2d 237 (1984); *State* v. *D'Antuono,* 186
Conn. 414, 421, 441 A.2d 846 (1982); *State* v. *Perez,*
182 Conn. 603, 606, 438 A.2d 1149 (1981). " ' "We then
determine whether, upon the facts thus established and
the inferences reasonably drawn therefrom, the jury
could reasonably have concluded that the cumulative
effect of the evidence established guilt beyond a rea-
sonable doubt . . . . In this process of review, it does

not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." ' " *State* v. *Plourde,* 208 Conn. 455, 458, 545 A.2d 1071 (1988), quoting *State* v. *Rollinson,* 203 Conn. 641, 665–66, 526 A.2d 1283 (1987), and cases cited therein.' *State* v. *Avis,* 209 Conn. 290, 309, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989)." *State* v. *Anderson,* 212 Conn. 31, 44, 561 A.2d 897 (1989).

The state presented to the jury several statements of the defendant, his confession to a cellmate, and various exhibits. Additionally, the jury had for consideration the defendant's own testimony and the testimony of others that the defense presented. Particularly significant and relevant to whether the defendant entered or remained in the victim's condominium unlawfully was the defendant's second taped statement to the police where, inter alia, he stated that Mooney told him that he had made a "score," and that he had somebody he called "Theo" tied up so that he could not contact anyone. In his third statement, the defendant stated his purpose for going with Mooney to the victim's home: "We took the VCR. I say we, I mean Mooney took the VCR. I was there to get what he owed me. If he was going to steal it from this guy, I didn't care, I just wanted what was mine." When the parties arrived at the victim's home, the defendant stated that Mooney opened the door with a key, but after they entered the house and went upstairs the defendant saw the victim naked on the floor, gagged and tied up with a cord. The defendant stated that "[the victim] was looking to me like help me."

It is the defendant's contention, however, that Mooney entered the premises with the permission of the victim or with a key provided by the victim. The defendant argues further that, since he entered the

premises with Mooney's permission, and neither the victim nor Mooney ever ordered him off of the premises, he was not unlawfully on the premises and, therefore, cannot be guilty of burglary. First, this argument assumes that Mooney had the house key with the victim's permission. The jury, however, was not compelled to accept that contention. Moreover, this argument is weakened by the defendant's own statements. In particular, the defendant stated that, when he saw the victim tied up, gagged, and naked on the floor, the victim looked at him as if he were asking for help. The defendant also stated that the victim was making a lot of noise so Mooney had to "shut him up." Moreover, the defendant stated that he watched Mooney choke the victim with an extension cord for about two to five seconds. Therefore, even if the defendant initially entered the victim's condominium lawfully, it is clear that "consent to remain was implicitly withdrawn and thus that the [defendant] 'unlawfully remained' within the meaning of the statute." *State* v. *Reyes,* 19 Conn. App. 179, 193, 562 A.2d 27 (1989).[6]

B

The defendant also argues that the trial court did not properly explain in its charge to the jury the element of "remaining unlawfully" for the offenses of burglary in the first degree and felony murder with burglary as its predicate felony. Specifically, the trial court, in detailing the elements of burglary for the jury, made the following statement concerning the state's position on "remaining unlawfully" as it applied to the case: "[E]ven if [the defendant] believed that Mooney had the right to invite him in, at the least, once he observed the predicament of [the victim] as the defendant's own testimony revealed, then his remaining from that

---

[6] The defendant also argues that consent to remain cannot be withdrawn implicitly. We address his contention in Part II B, infra.

position—from that time on became without license and became unlawful. That is the State's position as I gather it from the presentation of evidence and you are to deal with that as you see fit." The defendant argues that these comments by the trial court improperly instructed the jury regarding the element of "remaining unlawfully." We disagree.

Because there was no exception taken to the trial court's instruction on this point, we must first determine if the defendant's claim is reviewable under *State* v. *Evans,* supra, 70, and *State* v. *Golding,* supra, 239–40. Since " 'the failure to instruct the jury adequately on each essential element of the crime charged may have resulted in a violation of the defendant's due process rights implicating the fairness of his trial . . .' "; *State* v. *Anderson,* supra, 36, quoting *State* v. *Foster,* 202 Conn. 520, 537, 522 A.2d 277 (1987); we will review the defendant's claim.

"It is, of course, constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged." *State* v. *Williamson,* 206 Conn. 685, 708, 539 A.2d 561 (1988); see *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). We do not, however, conclude that the trial court's instruction was improper. In paraphrasing the state's position, the trial court simply explained to the jury that it could find that, even if the defendant had initially entered the victim's condominium lawfully, consent to remain could be implicitly withdrawn.

The defendant maintains that *State* v. *Thomas,* 210 Conn. 199, 554 A.2d 1048 (1989), holds to the contrary. The defendant's reliance on *Thomas,* however, is misplaced. In *Thomas,* we held that, when premises are "open to the public," a defendant does not lose his status as a member of the public by manifesting a criminal intent. Id., 207. Thus, the holding of *Thomas* does

not apply to a private dwelling that requires the continued consent of its occupant. See *State* v. *Grant,* supra, 31. Moreover, we stated in *Thomas* that the purpose of the definition of "enters or remains unlawfully" under § 53a-100 was " 'to make clear that only the kind of entry or remaining which is likely to terrorize occupants is prohibited by the crime of burglary. Thus, when the building is, at the time, open to the public, or the actor is otherwise licensed or privileged to be there, the element of terror is missing and the requirement is not met. This does not mean, however, that an initial lawful entry followed by an unlawful remaining would be excused. For example, A enters an office building during business hours—a lawful entry since the building is open to the public—and remains, perhaps hidden, after the building is closed, with intent to steal. A is guilty of burglary.' (Emphasis [omitted].) Commission to Revise the Criminal Statutes, Penal Code Comments, Connecticut General Statutes (1969) pp. 52–53." *State* v. *Thomas,* supra, 207–208. In addition, in *State* v. *Reyes,* supra, 192–93, the Appellate Court held that "[e]vidence that a defendant subsequently pointed a gun at one who had the right to admit him to the premises, and did admit him to the premises, clearly can form the basis for the inference that consent to remain was implicitly withdrawn and thus that the individual 'unlawfully remained' within the meaning of the statute."

Therefore, it is clear that the element of terror was present in the instant case. Just as pointing a gun in *Reyes* implicitly withdrew consent to remain, seeing the victim naked, gagged, and tied up on the floor, and seeing Mooney threaten, strike and choke the victim while the victim, in terror, looked for help, all clearly indicated to the defendant that, even if there were consent for his initially entering the condominium, it had been withdrawn.

## III

The defendant also claims that the trial court improperly instructed the jury on the requirements of felony murder: (a) by including accessory liability under § 53a-8 in its instructions on felony murder; and (b) by refusing the defendant's requests to charge numbered eight and nine regarding the limits of liability and the "in furtherance" requirement of the charge of felony murder.

### A

The defendant argues that the trial court should not have included the statutory principles of accessory liability under § 53a-8 in connection with its instructions on felony murder because the felony murder statute incorporates the principles of accessory liability applicable to the charge of felony murder. The defendant concedes that he took no exception to the accessory instruction. Nonetheless, he argues that the claim is reviewable because the accessory liability instructions violated his due process rights and implicated his right to a fair trial. Although we reviewed an identical claim in *State* v. *Simms,* 201 Conn. 395, 415, 518 A.2d 35 (1986), we concluded in *Simms* that such a claim did not rise to the level of a constitutional violation. In particular, we stated that "[w]e fail[ed] to see how the trial court's reference to the accessory statute unduly expanded the scope of criminal liability imposed under [the felony murder statute]." Id., 417. Thus, having found in *Simms* that the trial court's reference to accessory liability under § 53a-8 in its instruction on felony murder did not rise to the level of constitutional magnitude, the defendant's unpreserved claim does not satisfy the second prong of *State* v. *Golding,* supra, 239, and therefore is not reviewable on appeal.[7]

[7] The defendant attempts to distinguish *State* v. *Simms,* 201 Conn. 395, 518 A.2d 35 (1986), by arguing that this court in *Simms* held that the trial

## B

The defendant also contends that the trial court improperly refused to charge on his requests numbered eight and nine.[8] These requests dealt with a murder for personal motive and a murder committed during the felony but in a separate and distinct act to satisfy one participant's own end. We are not persuaded by the defendant's contention.

"A request to charge which is relevant to the issues of the case and which is an accurate statement of the law must be given. A refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance. *State* v. *Gabriel*, 192 Conn. 405, 418, 473 A.2d 300 (1984); *State* v.

court's use of the language from General Statutes § 53a-8 was proper only with respect to its being used to explain further the scope of the "in furtherance" requirement of the felony murder statute. The defendant ignores, however, the fact that this court clearly made reference to the fact that the trial court also "elaborated upon the words 'other participants' by express reference to the accessory statute, General Statutes § 53a-8." Id., 417.

[8] The defendant's requests to charge numbered eight and nine are as follows: "8. A murder for personal motive is an example of a death that is so far outside the ambit of the plan of the felony and its execution as to be unrelated to them. A murder for personal motive, then, is not a death 'in furtherance of' the underlying felony. *People* vs. *Lewis*, [111 Misc. 2d 682,] 444 N.Y.S.2d 1003 (1981). The following facts, supported by the evidence, are facts to which this proposition would apply: the victim was a homosexual male since the mid 1970's; the victim and David Mooney had been seen in each other's company several times and apparently had a relationship with one another; David Mooney engaged in homosexual acts with other males; David Mooney 'hustled' other males and stole from them; David Mooney was a drug addict; it is reasonable to infer that David Mooney caused the death of Theodore [G] not in furtherance of any felony but rather for a motive or purpose that was peculiar to and related to the relationship between the victim and David Mooney.

"9. Similarly, where a felon kills someone during the commission of a felony, but in a separate and distinct act and to satisfy his own end, his accomplice in the felony is not guilty of murder. *People* vs. *Wood*, [8 N.Y.2d 48, 167 N.E.2d 734,] 201 N.Y.S.2d 328 (1960)."

*Cooper,* 182 Conn. 207, 211, 438 A.2d 418 (1980)." *State* v. *Casey,* 201 Conn. 174, 178, 513 A.2d 1183 (1986). "This court has often repeated that ' " ' "[a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case." ' " ' *State* v. *Estep,* 186 Conn. 648, 651, 443 A.2d 483 (1982); *State* v. *Harris,* 172 Conn. 223, 226, 374 A.2d 203 (1977); *Amato* v. *Desenti,* 117 Conn. 612, 617, 169 A. 611 (1933). In reviewing a challenge to a portion of the jury instructions, the proper test is 'whether the charge, considered as a whole, presents the case to the jury so that no injustice will result.' *State* v. *Estep,* supra, 652." *State* v. *Shindell,* 195 Conn. 128, 143, 486 A.2d 637 (1985).

When the charge in the present case is viewed as a whole, it is clear that, although the trial court did not use the exact language of the defendant's requests numbered eight and nine, their substance was indeed included in the charge. Specifically, the trial court instructed: "[T]he State . . . would have to prove that the death of [the victim] was caused by [the defendant] or Mr. Mooney in the course of, and in furtherance of the crimes of either burglary or robbery. The phrase 'in furtherance of such crime' imposes the requirement of a logical nexus, that is a connection between the felony and the homicide. The connection between the underlying felony and homicide must be more than the mere coincidence of time and place. The nexus or connection must be one of logic or plan. This means that the felony murder statute excludes those deaths which are so far outside the plan of the felony and its execution as to be unrelated to that. In other words, a felony murder does not include any killing incidentally committed with the felony but only includes those felonies in the attempted execution of the felony of burglary

and robbery. Although the homicide itself need not be in the common design, the act which results in death must be in furtherance of the unlawful purpose. In other words, [the victim's] death must have been caused in furtherance of committing the burglary or robbery and not merely incidental to it." We conclude that the trial court's charge adequately instructed the jury on the requirement of a logical nexus between the felony and the homicide. Therefore, the defendant's claim is without merit.

## IV

Finally, the defendant argues that the trial court should not have instructed the jury on both alternative acts of robbery set forth in General Statutes § 53a-133[9] because there was insufficient evidence to establish that the victim was forced to "deliver up" any of his belongings as required for the second alternative, § 53a-133 (2). First, it must be noted that the defendant did not except to the trial court's instruction on § 53a-133 (2). "Our holding in *State* v. *Williams,* 202 Conn. 349, 362–63, 521 A.2d 150 (1987), however, makes clear that a claim that the jury was presented with alternative forms of committing the offense for which there is no evidence or insufficient evidence is reviewable under *State* v. *Evans,* supra, 70, because it implicates a defendant's fundamental right to be convicted only upon proof beyond a reasonable doubt." *State* v. *John,* 210 Conn. 652, 687, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

---

[9] "[General Statutes] Sec. 53a-133. ROBBERY DEFINED. A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

"This court has stated that '[w]here a person may have been convicted under more than one statutory alternative, the judgment cannot be supported unless the evidence was sufficient to establish guilt under each statutory provision which the trier may have relied upon.' *State* v. *Marino,* 190 Conn. 639, 650–51, 462 A.2d 1021 (1983); *State* v. *Thompson,* 197 Conn. 67, 79, 495 A.2d 1054 (1985)." *State* v. *John,* supra, 687–88. The trial court instructed the jury pursuant to § 53a-133 (2) that a person commits robbery if "the threatened use of physical force was to compel the owner of such property or another person to deliver up the property, or to engage in other conduct which aids in the commission of the larceny." The defendant claims that there was insufficient evidence to support an instruction on § 53a-133 (2) in this case. We disagree.

In *State* v. *John,* supra, 687–89, the defendants raised this precise issue. In *John,* the defendants were convicted of felony murder, with robbery as the predicate felony, as the result of beating the victim to death. Id., 654. The evidence indicated that the victim had been struck by a brick near the front of his house and then dragged by his feet to the rear where his body was discovered. His car keys and his car were later determined to be missing. Id., 658. While instructing on the elements of robbery, the trial court in *John* read both subsections of § 53a-133. This court then rejected the defendants' claim that there was insufficient evidence to warrant an instruction on subsection two. Specifically, this court stated: "From this evidence [of a struggle], the jury reasonably could have concluded that the defendants used this force to compel the victim to 'deliver up' the keys to his car, and having so failed, they '[overcame his] resistance to the taking of [his] property.' " Id., 688.

In the present case, the jury could have reasonably concluded that the force that was applied to the vic-

tim, i.e., tying him up, striking him, and choking him, was applied, at least in part, to force him to divulge the location of valuables.

The judgment of the trial court is affirmed.

In this opinion the other justices concurred.