James FLANDERS, Petitioner–Appellee,

v.

Larry R. MEACHUM, Commissioner of Corrections, Respondent–Appellant.

No. 523, Docket 93–2395.

United States Court of Appeals, Second Circuit.

Argued Oct. 26, 1993.

Decided Jan. 10, 1994.

Susan C. Marks, Asst. State's Atty., Wallingford, CT (John M. Bailey, Chief State's Atty. and Herbert Carlson, Jr., Asst. State's Atty., of counsel), for respondent-appellant.

Gary D. Weinberger, Asst. Federal Public Defender, Hartford, CT (Thomas G. Dennis, Federal Public Defender, of counsel), for petitioner-appellee.

Before: VAN GRAAFEILAND, WINTER, Circuit Judges, and KNAPP, District Judge.*

VAN GRAAFEILAND, Circuit Judge:

Larry Meachum, Commissioner of the Connecticut Department of Correction, appeals from a summary judgment of the United States District Court for the District of Connecticut (Nevas, J.) which granted James Flanders' petition for a writ of habeas corpus. For the reasons that follow, we reverse.

On November 10, 1987, Flanders was convicted after a trial in Connecticut Superior Court of burglary in the second degree and felony murder. He received concurrent sentences of ten years on the burglary count and sixty years on the felony murder count. Burglary in the second degree is entering or remaining unlawfully in a dwelling at night with intent to commit a crime therein. Conn. Gen.Stat. § 53a–102. A person is guilty of felony murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, etc. and in the course of and furtherance of such crime or of flight therefrom, he or another participant, if any, causes the death of a third person. Id. § 53a–54c. The Connecticut Supreme Court affirmed Flanders' conviction. State v. Flanders, 214 Conn. 493, 572 A.2d 983 (1990). The United States Supreme Court denied certiorari. 498 U.S. 901, 111 S.Ct. 260, 112 L.Ed.2d 217 (1990). Flanders sought federal habeas corpus relief for the felony murder conviction only. He did not challenge his burglary conviction.

A statement of the facts must to a large extent be an amalgam of the testimony of Annette Conaway and Flanders himself, whom counsel for Flanders described in his appellate brief as the "only two . . . out of the universe of people . . . who conceivably could have stabbed Walter Brzoska." Id. at 3. In some respects, the testimony of these two persons jibed; in others it did not. As to one significant matter, the separate stories were in accord—on the night of September 20, 1986, Conaway set out to "hustle" someone and Flanders joined her.

The two victims whom Conaway selected were brothers, Wladyslaw and Stanislaus Brzoska, Polish immigrants who lived with their cousin, Jan Brzoska, in a nearby New Britain apartment. Conaway accosted them on the street as they were returning intoxicated from a Polish festival. She inveigled an invitation from them to accompany them to their apartment. As she proceeded toward the apartment, she waved for Flanders to follow, which he did. From this point on, the testimonies of the two individuals differ.

Conaway testified that she did not see Flanders again until, glancing out of an apartment bedroom while in the company of the two Brzoskas, she saw Flanders trying to remove a television set from the kitchen. When asked whether she expected to see Flanders, she replied that she did because "we was hustling together." She said, however, that she did not know how Flanders got into the apartment. Flanders' more logical and believable testimony was that, while the Brzoskas were in the bedroom, Conaway opened the apartment door so that he could surreptitiously enter. He testified that he waited outside the apartment door for approximately five minutes before this entry took place. He denied that he attempted to steal the television set. Flanders and Conaway also differed concerning the order in which they left the apartment. Conaway testified that she left first and that Flanders was still in the apartment when she left. Flanders testified that when he left the apartment, Conaway was still there.

It is undisputed that Conaway accompanied the brothers to the apartment for the ostensible purpose of engaging in sex; that Stanislaus gave her $20 as an advance payment for these services, and that Wladyslaw partially disrobed in anticipation of the bargained-for services. When Conaway reneged on the bargain and refused to return the $20, an argument between her and Wladyslaw ensued. According to Conaway, when Wladyslaw began to pantomime stabbing "some-

---

* The Honorable Whitman Knapp, Senior United States District Judge for the Southern District of New York, sitting by designation.

body's eyes out," with a knife, she fled the apartment and waited for Flanders near a furniture store on the other side of the street. Conaway did not say what, if anything, Flanders did during this argument and threat which took place in the kitchen where Flanders was. Leaping this gap, she said that, after waiting outside for approximately one hour, she went back to the apartment, peeked under the apartment door, and saw Wladyslaw lying on the floor with blood on his chest.

Flanders testified in substance that he simply remained in the kitchen, partially hidden alongside a refrigerator, waiting for Conaway to leave. He said that he stayed there for approximately twenty-five minutes, during which he twice secretly pantomimed to Conaway his intentions of leaving; that he finally left without her and went home. He made no mention of the argument between Conaway and Wladyslaw which must have occurred within a few feet of where he was standing.

The prosecution produced substantial evidence that Flanders was the killer. Four witnesses testified, in not completely accurate and consistent detail, that Flanders had admitted to them that he had killed a man in an apartment by stabbing him with a knife. One of the witnesses testified that, on the night of the killing, she encountered Flanders, who was running. In response to the witness' questions, Flanders allegedly told her that he and Conaway had been in an apartment on Broad Street; that several men had tried to attack him and he had stabbed one of them with a kitchen knife. This conversation was confirmed by a second witness who was present at the time.

Another witness testified that he talked with Flanders on the telephone shortly after the killing and told him that the police were looking for him. Flanders responded, "Should I break?" Flanders then added, "Four guys were coming at me and one had a knife. I had to jug one with a knife." Flanders said that the reason he did this was because he was in an apartment and had to get out. A fourth witness testified that on the evening following the killing Flanders told her that the victim was coming at him

with a knife and that he grabbed the victim's wrist and turned the knife against him.

Clearly the State had a strong case against Flanders. However, as Flanders' attorney ably pointed out in his summation, the State, perhaps unintentionally, had presented a strong case against Conaway also. She originated the "hustle" and invited Flanders to join her. It was she who got into a heated argument with Wladyslaw because she reneged on her offer of sex and refused to return the $20 which she had been paid. According to Flanders, he left the apartment before the stabbing, and Conaway was still there. Moreover, the jury might have discredited, as unbelievable, Conaway's testimony that after she left the apartment she waited outside for about an hour, then returned and by looking under the apartment door was able to see Wladyslaw lying on the floor with blood on his chest. Assuming that Conaway could see all she claimed to have seen by looking under the door, her testimony on this point was undermined by Flanders' testimony that the door had a window in it which made under-the-door peeking unnecessary.

In short, under the evidence presented to the jury it could have decided that both Flanders and Conaway were lying and that either, or both of them, did the killing. The trial court therefore properly charged the jury concerning the crime of felony murder. So that the jury would have a clear understanding of what might constitute felony murder in the instant case, the trial judge devoted a substantial portion of his charge on this issue to the preliminary requirement of what constitutes a burglary, which he described as an "intrusionary offense." He said that to be guilty of burglary the defendant must have knowingly entered or remained unlawfully in the apartment and that the unlawful entry or remaining was effected or occurred with the defendant's intent to commit a crime therein. Emphasizing the term "remained", the court instructed the jury that regardless of how the defendant entered the apartment, he was guilty of burglary if he remained there unlawfully.

The trial judge also correctly instructed the jury that, even if the defendant never

actually committed a crime in the apartment, if he was in the apartment with such intention, this would be sufficient to prove that he entered or remained therein with an intent to commit a crime. The specific crime or crimes intended to be committed need not actually have been committed. This was a correct statement of the law. *See State v. Little*, 194 Conn. 665, 675–76, 485 A.2d 913 (1984); *State v. Benton*, 161 Conn. 404, 411, 288 A.2d 411 (1971); 12A C.J.S. *Burglary* § 42.

■ Although the trial court's definition of burglary was directed to the defendant Flanders, the jury could have applied it equally to Conaway. The trial court's instruction to the effect that, regardless of how a person enters a building that person is guilty of burglary if he remains there unlawfully, fits both Flanders and Conaway. *See State v. Allen*, 216 Conn. 367, 382–84, 579 A.2d 1066 (1990). Although Conaway was invited into the apartment, the invitation was procured through fraud. It was her intent to hustle the Brzoskas. Whether she had this larcenous intent when she entered, she clearly had it while she remained. She had it when she surreptitiously admitted Flanders to the apartment. In short, to use a phrase of common parlance, the two of them were "up to no good," or, as Conaway herself put it, "we was hustling together." The district court's statement that Conaway was "on the premises lawfully," *Flanders v. Meachum*, 824 F.Supp. 290, 306 (D.Conn.1993), is simply wrong. Equally wrong is the district court's statement, *id.*, that the State does not contest that Conaway remained on the premises lawfully. The district court's citation to the Connecticut Supreme Court's opinion, 214 Conn. at 497, 572 A.2d 983, does not support the district court's assertion.

■ Moving now from the burglary statute to the felony murder statute, we see that the latter provides in substance that when a person, acting alone or with another person commits a burglary, and in the course and furtherance of that burglary or flight therefrom, he or the other participant causes the death of a third person, the burglar or burglars are guilty of felony murder. As stated above, a burglary does not end when the burglar enters the premises; it continues for as long as the burglar is on the premises with the intent to commit a crime. Bearing this in mind, the following excerpt from the Connecticut Supreme Court's opinion in *State v. MacFarlane*, 188 Conn. 542, 552–53, 450 A.2d 374 (1982), is pertinent and persuasive:

The defendant's fourth claim is that the trial court erred in instructing the jury that "our law is crimes against a person such as a burglary are in common experience likely to involve danger to life in the event of resistance by the victim, or the attempt of the perpetrator to make good his escape and conceal his identity. It is a probable and natural and reasonable consequence of the attempt to commit such a crime that a human life will be destroyed. The commission of burglary is a crime that may cause the death of an innocent person as a consequence of this under our law." The defendant disputes the validity of each of these instructions, contending basically that burglary is not a crime against a person and is unlikely to result in death. These instructions were apparently an adaptation of one of the charges regarding felony murder suggested by Judge Douglass B. Wright in 2 Connecticut Jury Instructions (2d Ed.1975) § 694(q). Judge Wright illustrated the instructions by utilizing robbery as the underlying felony. In this case the trial court substituted the appropriate felony, burglary, and included the instructions presumably to explain the rationale behind the elements that the death must be caused "in the course of and in furtherance of" the burglary.

. . . . .

We are not persuaded by the defendant's claims that burglary is a crime against property and is unlikely to result in death. An element of burglary in the second degree is that the accused "enters or remains unlawfully in a dwelling at night...." General Statutes § 53a–102. A "'dwelling' means a building which is usually occupied by a person lodging therein at night, whether or not a person is actually present...." General Statutes § 53a–100(a)(2). Accordingly, one who is in the

course of a burglary is likely to encounter the person lodging at the dwelling at night, who may resist, and in furtherance of the burglary death of the dweller is likely to result. The instructions were not erroneous.

The foregoing quote may be joined appropriately with the following excerpt from the Connecticut Supreme Court's opinion in *State v. Rossi*, 132 Conn. 39, 44, 42 A.2d 354 (1945):

> All who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance of, or in furtherance of, the common design.

■ We think it clear beyond cavil that when Conaway surreptitiously admitted Flanders to the apartment because they were "hustling" together, she was a participant in a common design to commit an unlawful act, i.e., that she was a participant in the underlying burglary. *See MacFarlane, supra*, 188 Conn. at 550, 450 A.2d 374. The felony murder statute "contains no mens rea requirement beyond that of an intention to commit the underlying felony upon which the felony murder charge is predicated." *State v. Valeriano*, 191 Conn. 659, 662, 468 A.2d 936 (1983), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2351, 80 L.Ed.2d 824 (1984). Thus, under the felony murder count, it makes no difference whether Conaway or Flanders did the actual killing, which must have occurred either during the course of the burglary or the flight therefrom.

■ With the foregoing as a background, we now turn to the question which prompted the petition for and grant of habeas corpus relief, viz, did the trial judge commit an error of prejudicial constitutional magnitude when he refused to admit evidence from the deceased's cousin that he had heard Wladyslaw say "kurwa czarnota" and "przebity bylem przez kurwa" shortly before he died. An interpreter was prepared to testify that "kurwa czarnota" meant "black whore," and that "przebity bylem przez kurwa" meant "I was stabbed by a whore." This, of course, would have been additional probative evidence that Conaway was the killer. The State concedes that the evidence should have been admitted but contends that, in view of Flanders' acquittal on the murder charge and his conviction on the felony murder charge, Flanders was not deprived of his constitutional right to a fair trial. This, in substance, is what the Connecticut Supreme Court held. *Flanders, supra*, 214 Conn. at 501, 572 A.2d 983 (footnote omitted):

> The excluded testimony concerned the identity of the person who caused the death of Wladyslaw Brzoska. In a prosecution for murder this evidence would be exculpatory. In the present case, however, the defendant was acquitted of murder and convicted of felony murder and burglary. The issue is whether the erroneous exclusion of testimony deprived the defendant of a fair opportunity to defend the felony murder and burglary charges.
>
> The felony murder statute does not require that the defendant commit the homicidal act, but instead requires that "[the defendant], or another participant, if any, causes the death of a person other than one of the participants." General Statutes 53a–54c. The excluded evidence is exculpatory only if it indicates that neither the defendant nor any participant in the felony caused the death. The testimony implicating Conaway as the person who stabbed the victim does not provide a defense to felony murder because there was a basis in the evidence for the jury reasonably to have found that Conaway was a participant in the felony.

We agree.

The parameters of a federal court's authority to grant habeas corpus relief from a state court conviction have been explored on numerous occasions and no repetitive definition is required herein. *See, e.g., Brecht v. Abrahamson,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Prominent in all the cases is the proposition that the states have the primary authority for defining and enforcing their own criminal law. *Id.* at ——, 113 S.Ct. at 1720; *Engle v. Isaac,* 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783

(1982). A federal court therefore must have a clear understanding of a state's criminal law as interpreted by the state courts before it can determine whether the state committed prejudicial constitutional error in enforcing it. Our reading of the district judge's lengthy opinion satisfies us that he misapplied Connecticut law.

As already pointed out, we are satisfied that the district court erred in holding that Conaway was on the deceased's premises lawfully when she reneged on the promise that gained her entrance, when she refused to return the $20 that had been paid her, and when she surreptitiously admitted Flanders to the apartment knowing that he was a partner in her plan to hustle the intoxicated occupants. It hardly can be disputed that Conaway's admission of Flanders was in furtherance of their joint plan to hustle. Assuming for the argument that Conaway initially entered the apartment lawfully, the consent for her to remain there was implicitly withdrawn when she engaged in hostile and unlawful acts. *Allen, supra,* 216 Conn. at 382–84, 579 A.2d 1066. The district court erred in holding that, at best, Conaway would be committing larceny, not burglary. 824 F.Supp. at 306. Even though she committed larceny, she nevertheless was guilty of burglary. Indeed, the latter requires an intent to commit the former.

The district court also gave undue emphasis to the trial court's failure to charge the Connecticut accessorial statute. Conn.Gen. Stat. § 53a–8. Acknowledging the absence of any direct Connecticut law requiring such a charge in a felony murder case such as this, 824 F.Supp. at 304 n. 11, the district court nonetheless stated that "the fact that the jury received no formal instructions on accessory liability deepens the court's concern that the jury did not consider the elements required to establish Conaway's status as a 'participant,'" and "is simply another indication that Flanders' conviction for felony murder as a co-participant in a killing committed by Conaway is of questionable validity." *Id.* at 304, 305. This statement simply demonstrates the district court's failure to apply the Connecticut felony murder statute as it continually has been applied by the Connecticut

courts. The mens rea required by this statute is not the intent to commit murder but to participate in the felony that led to the murder. "In other words, the defendant, admittedly a willing and active participant in the underlying burglary, was accountable as a principal for the acts of the other participant in causing the death of the victim, assuming that the defendant did not actually kill [him]." *MacFarlane, supra,* 188 Conn. at 550, 450 A.2d 374; *see State v. Young,* 191 Conn. 636, 639–43, 469 A.2d 1189 (1983); *State v. Simms,* 201 Conn. 395, 417–18, 518 A.2d 35 (1986). This is not an unfair rule as applied to burglars, since the likelihood that death may result from a burglary is clearly recognized under Connecticut law. *MacFarlane, supra,* 188 Conn. at 552, 450 A.2d 374. Moreover, the Connecticut rule is not a drastic departure from the common law, which found the malice aforethought required for a first degree murder "where the homicide was not intended but occurred during the commission of a collateral felony." *People v. Luscomb,* 292 N.Y. 390, 395, 55 N.E.2d 469 (1944). The malice of the underlying felony is attributed to the felony murder by "the legal fiction of transferred intent." *People v. Wood,* 8 N.Y.2d 48, 51, 201 N.Y.S.2d 328, 167 N.E.2d 736 (1960).

### CONCLUSION

After carefully reviewing the trial court's erroneous evidentiary ruling, the Supreme Court of Connecticut held that the error "was not of constitutional magnitude." 214 Conn. at 500–02, 572 A.2d 983. Assuming for the argument only that the error was of constitutional magnitude, our *de novo* review of the record satisfies us that the error did not have "substantial and injurious effect or influence in determining the jury's verdict." *Brecht, supra,* —— U.S. at ——, 113 S.Ct. at 1722; *see Washington v. James,* 996 F.2d 1442, 1445 n. 1 (2d Cir.1993).

The judgment of the district court is reversed and the matter is remanded to the district court with directions to dismiss the petition.