James FLANDERS

v.

Larry R. MEACHUM, Commissioner
of Corrections.

Civ. No. 2:91CV00087 (AHN).

United States District Court,
D. Connecticut.

May 10, 1993.

Gary D. Weinberger, Office of Fed. Public Defender, Hartford, CT, for Flanders.

Susan Marks, James A. Killen, Office of Chief State's Atty., Wallingford, CT, for Meachum.

## SUPERSEDING RULING ON OBJECTION TO MAGISTRATE'S RECOMMENDED RULING

NEVAS, District Judge.

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). Petitioner, James Flanders ("Flanders"), is serving 10- and 60-year concurrent sentences at the Connecticut Correctional Institution at Somers following his convictions on burglary in the second degree and felony murder in Connecticut Superior Court on November 10, 1987. Flanders' Petition challenges his felony murder conviction alleging that Superior Court Judge George W. Ripley erroneously excluded exculpatory testimony at his trial and that the exclusion of that evidence constituted a violation of his fundamental right to a fair trial under the Sixth and Fourteenth Amendments. On October 26, 1992, Magistrate Judge Joan G. Margolis filed a written opinion recommending that summary judgment enter in favor of the State of Connecticut (the "State") and that the Petition be denied. *See Flanders v. Meachum,* Civil No. 2:91CV00087 (AHN) (D.Conn. October 26, 1992) slip op. at 2, 13 (the "Magistrate's Recommended Ruling"). Currently pending is Flanders' objection to the Magistrate's Recommended Ruling. For the reasons stated below, the court declines to adopt the Magistrate's Recommended Ruling, DENIES the State's motion for summary judgment, and GRANTS summary judgment for Flanders on the Petition.

### Background

■ In setting forth the factual and procedural context underlying Flanders' Petition, the court is mindful that it accords "a 'presumption of correctness' to state court findings" of fact where such findings are predicated on "a hearing on the merits. . . ." *Ventura v. Meachum,* 957 F.2d 1048, 1054 (2d Cir.1992). This presumption attaches "unless the conditions for one of the seven listed exceptions are met or unless the state court findings are not 'fairly supported' by the record as a whole." *Id.* (citing *Sumner v. Mata,* 449 U.S. 539, 550, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981); *see also* 28 U.S.C. § 2254(d). In this circuit, however, the presumption " 'is not irrebuttable,' " but may be overcome where a petitioner provides " 'clear and convincing evidence that the factual determination by the state court was erroneous.' " *Ventura,* 957 F.2d at 1054 (citation omitted).

■ The deference accorded state courts on habeas review, moreover, extends to "implied as well as express findings of fact, *Marshall v. Lonberger,* 459 U.S. 422, 433–434 [103 S.Ct. 843, 850, 74 L.Ed.2d 646] (1983), and to the findings of state appellate courts as well as state trial courts, *Sumner,* 449 U.S. at 546–547 [101 S.Ct. at 768–769]." *Ventura,* 957 F.2d at 1055. Although deference is not required on mixed issues of fact and law, "the presumption does apply to 'matters of "historical fact" and to factual

inferences to be drawn from the historical facts.' " *Id.* (citations omitted). The presumption of correctness "therefore covers a state appellate court's elucidation of the findings of a state trial court. . . ." *Id.*

Applying these rules, the relevant facts in this·case are as·follows.[1] Wladyslaw, Stanislaus, and Jan Brzoska were Polish immigrants who lived in a third-floor apartment.at 174 Broad Street in New Britain. Wladyslaw and Stanislaus were brothers. Jan was their cousin. The three roommates spoke little English.

On Saturday, September 20, 1986, all three attended the New Britain Harvest Festival. The Brzoska brothers, Wladyslaw and Stanislaus, left the festival before their cousin Jan. While *returning* home early next morning between 1:00 and 1:30 a.m., Wladyslaw and Stanislaus, both of whom were intoxicated, encountered Annette Conaway ("Conaway"), an African–American woman, on ·a street corner near their apartment.

Just prior to that encounter, Conaway met Flanders. Flanders inquired as to what Conaway was doing on the street corner. Conaway announced that she was waiting for some drunk men to come along so that she could hustle them to which Flanders responded, "Well, I'm going to stay with you." Conaway replied, "I don't care."

Upon seeing Wladyslaw and Stanislaus approach, Conaway crossed the street to speak with the brothers. They invited Conaway back to their apartment and the three proceeded across the street, into the alley leading to the apartment. Before entering the apartment building, Conaway waved her arms in a manner that Flanders interpreted to mean "come on."

After she and the two brothers arrived at the apartment, Conaway went into the kitchen and poured three glasses of vodka. Stanislaus gave Conaway a $20 bill, ostensibly to perform sexual services. Conaway proceeded to Stanislaus' bedroom with both the brothers. A discussion ensued in which Stanislaus changed his mind and asked for the $20 back. Conaway refused to comply. At that time, from the vantage.point of Stanislaus' bedroom door, Conaway observed Flanders in the apartment trying to lift a television out of the kitchen. Conaway testified that she was not surprised to see Flanders in the kitchen because she and Flanders were "hustling together." Conaway and the Brzoska brothers continued to argue in Stanislaus' bedroom about her failure to perform sexual services and return the $20. After a period of time, Wladyslaw and Conaway moved out of the bedroom into the kitchen to continue their discussion. Stanislaus remained in his bedroom and fell asleep. Conaway gave Wladyslaw two $1 bills in an effort to settle their dispute. In response, Wladyslaw became upset and gestured by pantomiming about getting a knife and stabbing "somebody's eyes out." At that point, Conaway left the apartment and proceeded across the street to wait for Flanders near a.furniture store.

Although she previously had seen Flanders walk in the direction of the door exiting the apartment while in ·the bedroom with ·the ·Brzoska brothers, Conaway testified that she was unaware of Flanders whereabouts at the time she left the apartment. About one hour later, Conaway returned to the Brzoskas' apartment.[2] She got ὸn her knees to look under the kitchen door where she saw Wladyslaw lying on the floor with blood on his chest.

---

1. Unless otherwise referenced to specific parts of the record, the facts relating to the underlying incident in this case are taken directly from the Connecticut Supreme Court's determination of what the jury "could reasonably" have found at trial. *See State v. Flanders,* 214 Conn. 493, 496–498, 572 A.2d 983, *cert. denied,* 498 U.S. 901, 111 S.Ct. 260, 112 L.Ed.2d 217 (1990).

2. A discrepancy in the record exists as to what prompted Conaway to return to the Brzoskas' apartment. The Connecticut Supreme Court

concluded that Conaway returned to the apartment "because, 'I [Conaway] knew I had poured that vodka in the glasses. I knew my fingerprints would be on the glasses.' " *Flanders,* 214 Conn. at 497, 572 A.2d 983. The parties agree, however, that this characterization is "erroneous" and that the concern about.her fingerprints prompted Conaway to disclose to the police that she was in the apartment. (*See* Filing No. 14, Pet.'s Mem.Supp. at 7, n. 1; Filing No. 16, Resp.'s Mem.Opp. at 4, n. 2.)

Around this time, Stanislaus was awakened by the sound of his brother moaning the word "oye." Stanislaus went into the kitchen where he found his brother lying on the floor with a stab wound to his chest. Stanislaus asked his brother what happened. Wladyslaw responded: "to this black-to this charnota, I was stabbed."[3] Wladyslaw then requested that Stanislaus call his sister, Regina Deblowski, and an ambulance. At that point, Jan returned to the apartment. Following Jan's arrival, Regina arrived at the apartment and saw Wladyslaw lying on the floor saying, "Oh, mother of God." Wladyslaw said nothing further and lapsed into unconsciousness. Shortly thereafter the police were called. Wladyslaw was treated and removed by emergency medical technicians to New Britain General Hospital where he died.

On October 3, 1986, Flanders was arrested and charged with the murder of Wladyslaw Brzoska. On January 23, 1987, Superior Court Judge Harry Hammer found probable cause for the charges of murder in the first degree and felony murder against Flanders. On September 8, 1987, a third count of burglary in the second degree was added. Conaway was not charged with any crime in connection with the incident.

On October, 15, 1987, prior to trial, Flanders filed a supplemental motion for a bill of particulars. In the motion, Flanders sought additional information on the felony murder count as to (1) whether defendant was acting alone or with another person or persons; (2) the names of any other person or persons who was a co-participant with the defendant; (3) whether defendant or the co-participant is alleged to have caused the death of the victim; and (4) if a co-participant is alleged to have caused the death, the name of the co-participant alleged to have caused the death.

(*See* 10/16/87 Trans. at 26.) After oral argument, Judge Ripley denied Flanders' motion. (*Id.* at 33.)

At trial, the State presented four witnesses who testified that Flanders made certain admissions to them. Eddie Rose, Jr., Conaway's live-in boyfriend at the time of the incident, testified that Flanders told him in a telephone conversation after September 21, "Four guys were coming at me and one had a knife" and that "I had to jug one with a knife." Lois Brown, Rose's girlfriend at the time of trial and the woman with whom he has a five-year old child, testified that Flanders had told her that he grabbed a man's wrist and stabbed the man with his own knife and that this had taken place on Broad Street. Shirley Williams testified that she was out walking in New Britain in the late evening of September 20 and the early morning of September 21 when she encountered Flanders running. During this encounter, Williams testified that Flanders stated that he and Conaway had been at a house on Broad Street, that several men had tried to attack them, and that he, Flanders, had stabbed one of them with a kitchen knife. Willie Holley testified that he was present during Williams' encounter and confirmed her testimony.

In addition, the State called several witnesses, including Conaway, who placed Flanders in the apartment around the time of the incident. Forensic evidence was introduced, moreover, that Flanders' partial palm print was on the refrigerator in the kitchen where Wladyslaw was stabbed.

After the State rested, Flanders filed two motions directed to the sufficiency of the felony murder count contained in the information. The first was for a judgment of acquittal on the felony murder count. The

---

**3.** "Charnota" is the phonetic spelling used in the trial transcripts that were quoted by the Connecticut Supreme Court in its ruling. The term is apparently spelled "czarnota" in Polish and means black person. Flanders contends that czarnota is sex neutral and singular.

The court, moreover, notes that Wladyslaw's post-stabbing statements were admitted into evidence without objection through the testimony of Stanislaus Brzoska and Regina Deblowski, Wladyslaw's sister, during the prosecution's case in chief. As will become evident, other post-stabbing statements made by Wladyslaw, statements Flanders contends were exculpatory and which the defense attempted to introduce during its case in chief, were excluded as hearsay by Judge Ripley pursuant to an objection by the prosecutor. Accordingly, those statements are set out in a subsequent recitation of the procedural context in which they arose during trial rather than in this description of the incident because they were not part of the evidence considered by the jury.

second was a motion requesting a substituted information in which the State would sever the felony murder count into two separate counts: one in which Flanders committed the actual killing and an additional count in which felony murder is predicated on a theory that Flanders was a co-participant in a homicide committed by somebody else. (*See* 10/28/87 Trans. at 3.) Both motions were directed to the issue of whether a co-participant theory of felony murder was in the case. (*Id.* at 3–12.) At argument, the following colloquy took place:

MR. CARLSON (the prosecutor): Now, while I'm certainly not going to argue that she [Conaway] is a co-participant, that doesn't necessarily mean that the jury could not so find, if that's what they thought was appropriate to do so, so that whether or not he's acting alone or whether or not he's acting together, in either way, I would suggest that there is enough to go to the jury.

\* \* \* \* \* \*

MR. GOLD (defense counsel): Okay, well, could I ask to have his statement read back because here we are halfway through this trial, halfway in that one side has rested, one side is set to begin and the State has put on its evidence, I could sit down and rest right now and say we're not going to proceed with any evidence, the defense rests, which we don't intend to do, but at some point I think the State has to commit itself to a theory of what they're claiming my client did, so that—I mean if I heard him correctly, he's not claiming that she's a co-participant, and the bottom line is that even—I don't recollect the exact words he claims that this Willie Holly said about them in the apartment together getting high, well, if they're in the apartment together getting high, that would certainly negate any claim that my guy—my client was committing a burglary, if—because, and I think, as he said it, it was implying or specifically stating that he was like invited in there by these gentlemen, and his own evidence indicates that my client was not invited in there. The only person who was invited in there, and had the right— the right to be there, was Annette Cona-

way, so that under—you know, again looking at the evidence in certainly the most favorable light, which we have to do, and that is the one thing that Mr. Carlson and I agree on, that the—looking at the best light, she was not participating in a felony, certainly not participating in a burglary, and unless there is another person that they're claiming is a co-participant, I think that any allegation that my client was acting in concert with another person on the felony murder count, whether or not it's claimed that my client was the one who had caused the death, or whether the other person caused the death, I think has to be knocked out at this time for a Motion for Judgment of Acquittal.

The record certainly just does not support it.

\* \* \* \* \* \*

THE COURT: The charging document follows the language of the statute upon which the State is proceeding, and when one considers that, one, in judging a Motion for a Judgement of Acquittal, can pick and choose from all of the evidence, accepting that portion of the evidence that may support the offense, the elements in rejecting that which don't—which is the way the Court must view the evidence, because that is—the opportunity of the jury is to pick and choose from all or any part and accept or reject all or any part of any of the evidence that's put before them. It strikes the Court that the jury could, based upon the evidence presented, conclude that the Defendant was guilty for the first count and was guilty of the second count. I know of no basis on which the Court can or should depart from the language of the statute and attempt to more precisely define the elements of felony murder as set forth in the second count. When it speaks of acting alone or with one or more other persons committing or attempting to commit the crime, it strikes the Court that if taking the evidence as a whole, rejecting that which does not support the offense, and if the Court can find support for the elements of all or any part of the charge of felony murder and the acting alone and/or with or other—more

other persons, if taking the evidence as a whole, the Court can find the thread going through supporting the offense of felony murder, either acting alone or with one or more others committed or attempting to commit, if a thread can be woven through to connect all or any part of those things, it seems to me that the State has sustained its burden, at least insofar as having a case to go to a jury for a determination. That being the case, I think the motion should be and is denied. Exception may be noted.

(10/28/87 Trans. at 22, 25–28.) The court also denied the motion requesting a substituted information. (*Id.* at 30.)

The defense called Flanders. Flanders testified that he had gone directly home after leaving the Brzoskas' apartment. He denied having seen Shirley Williams and Willie Holley on the evening of the stabbing. He also denied having made the incriminating statements attributed to him by Rose or Brown.

The defense, moreover, offered the testimony of Jan Brzoska regarding certain exculpatory statements made by Wladyslaw after he was stabbed. The State objected to these statements as hearsay. At a proffer, conducted outside the presence of the jury, Jan testified that he had heard Wladyslaw say, "kurwa czarnota" and "przebity bylem przez kurwa" as his cousin lay on the floor. A New Britain police officer confirmed that Jan had told the police about Wladyslaw's statements on September 22, 1986, one day after the stabbing and that the statements were contained in the police report. During the proffer, it was disclosed that "kurwa czarnota" was polish for "black whore" and that "Przebity bylem przez kurwa" translated to "I was stabbed by a whore." After a lengthy argument, the trial court sustained the State's objection and excluded Jan's testimony as hearsay.

Prior to closing arguments, the defense renewed its motions for a judgment of ac-

quittal on the felony murder count and, in the alternative, for a substituted information requiring the State to split the felony murder count into separate counts of single participant and co-participant theories of felony murder respectively. (*Id.* at 1074–75, 1079.) In opposing the motions, the prosecutor conceded that "in the event the jury acquits the defendant of murder but convicts him of felony murder, then I will agree that he [Flanders] should be sentenced as if he were a participant and not the actual killer." (*Id.* at 1080.) The court denied Flanders' motions.[4]

During its summation, the State argued to the jury that Flanders alone had killed Wladyslaw. The prosecutor theorized that Flanders entered the apartment, uninvited by either Conaway or the Brzoskas, with the intent to steal, that he got caught in the act, and that he stabbed Wladyslaw as he fled the apartment. (*See id.* at 1084–1087.) Throughout the argument, moreover, the prosecutor insisted that Flanders had acted alone when he killed Wladyslaw:

> You might say—I would expect Mr. Gold is going to argue, well, obviously, I mean Annette, she must be the perpetrator. That's probably what Mr. Gold is going to tell you. She has to be the killer. In order to save her own skin she has to pin it on James. Well, you know, that's something for you to consider. Okay. But when you consider that, consider whether or not there has been any evidence at all that Annette had admitted to any body she killed, stabbed or hurt anybody. *There is no evidence that Annette did any of that. All there is is just to say she has to save herself she has to pin it on him.*
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> And Mr. Gold said to you that Annette Conaway wants you to believe that James Flanders did it. I don't necessarily know that that's true. The State of Connecticut wants you to believe. Whether or not

4. At the sentencing, Flanders was sentenced to sixty years on the felony murder conviction, the maximum allowed under Conn.Gen.Stat. § 53a-35. The record reveals that the only request that Flanders' role in the offense as a participant be taken into consideration as a mitigating factor in determining the sentence was made by the defense. The record does not reflect that Flanders' role in the offense was taken into account by Judge Ripley in imposing the sentence. (*See* 1/11/88 Trans. at 15–16.)

Annette has a personal interest in the outcome of this case or not, that's for you to decide. But what's going to happen to Annette whether the defendant is convicted or not convicted? It's not going to change her position here. *The State has no evidence to show that she did it. Because if there were evidence, Mr. Gold would have brought it forward to you and said she admitted this, she admitted that. See, there is all kinds of stuff. There isn't anything that was brought forward to you to show that Annette did it other than what Mr. Gold has given to you as a little nibbling on my case.*

\* \* \* \* \* \*

As for the witnesses, there are no deals. If there were, the State would have to tell you. Okay. So you determine that. Very simply, this man who was drunk was stabbed in his own home. And, very simply, I suggest to you that he was stabbed by James Flanders because James Flanders told four people that he stabbed the man.

\* \* \* \* \* \*

And I suggest to you that that is the nub of the case. Walter caught him in the commission of the burglary. And in order to get out, as he said, "I got caught in the apartment and Annette left me there", [sic] or words to that effect. "I got caught in the apartment. I had to stab the guy. I jugged him."

(11/6/87 Trans. at 1091, 1142, 1147–48 (emphasis added).)

In its requests to charge, the defense sought jury instructions on felony murder and on the motive of Annette Conaway. First, the defense requested that the jury be charged on elements necessary to support a conviction under two separate theories of felony murder, one in which Flanders was the killer and the other in which Flanders was only a participant. (*See.* Def.'s Req. to Charge ¶ 4.) Second, Flanders sought an instruction that the motive of Annette Conaway, that she could be charged with murder, was relevant to evaluating the credibility of her testimony. (*Id.* at ¶ 5.) Judge Ripley refused to charge on separate theories of

felony murder but agreed to read an instruction on motive. (*See* Nov. 6, 1987 Trans. at 1073–74.) The State, moreover, did not request a charge, nor did the court instruct on the elements of aiding and abetting a crime.

Judge Ripley charged the jury in relevant part as follows:

In order to convict the defendant, Mr. Flanders, of murder you must first find that he caused the death of Wladyslaw Brzoska. You must find beyond a reasonable doubt that Wladyslaw Brzoska died as a result of the actions of the defendant. Next you must conclude that the person causing the death of the victim must have done so with the intent to cause death. A person acts, quote, intentionally, unquote, with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct.

\* \* \* \* \* \*

Next, felony murder. The second count accuses James Flanders of the crime of felony murder. \* \* \* The defendant is charged with the crime of felony murder in violation of 53a–54c of the Connecticut General Statutes. The defendant is charged with the crime of felony murder in violation of 53a–54c of the Penal Code, which defines felony murder as follows, quote, a person is guilty of murder when acting either alone or with one or more persons, he commits or attempts to commit the crime of burglary and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants.

By this law the legislature has provided that when during the actual commission or attempted commission of a felony or in the immediate flight therefrom the perpetrator causes the death of another person the perpetrator is guilty of felony murder. It does not matter that the act which caused the death was unintentional or accidental rather than with the intention to cause death. Nor does it matter if the death was a result of the victim's fear or flight. The perpetrator is as guilty of this form of murder as he would be if he had intention-

ally committed the act which caused the death.

(11/6/87 Trans. at 1174–76.)

During its deliberation, the jury submitted several questions to the court. First, the jury asked: " 'In the translated testimony of Stanley Brzoska does the English translation of the Polish word for black person [czarnota] quote, unquote, indicate gender or singular or plural, question mark.' " (11/9/87 Trans. at 1208.) In response, the court instructed the court reporter to read certain excerpts from the trial transcripts.[5] Second, the jury asked: "There is some question in our minds concerning that part of the second count that states in part, dash, he or another participant, if any, caused the death, unquote, dash." (11/10/87 Trans. at 1220.) The court responded by reading back its jury charge on felony murder.

On November 10, 1987, the jury returned a verdict of not guilty on the charge of murder in the first degree and guilty on the charges of felony murder and burglary. On January 11, 1988, Judge Ripley imposed concurrent sentences of sixty years for felony murder and ten years for burglary in the second degree.

On direct appeal to the Connecticut Supreme Court, Flanders raised three issues: (1) the trial court erred in excluding the testimony that the victim was stabbed by a "black whore"; (2) the trial court's refusal to order a supplementary bill of particulars denied the defendant his right to fair notice of the charges against him; and (3) the trial court's refusal to charge the jury on felony murder as requested violated defendant's right to a unanimous verdict. *See State v. Flanders*, 214 Conn. 493, 572 A.2d 983 (1990).

In a unanimous opinion, the Court affirmed Flanders' conviction. The State conceded and the Court found that the exclusion as hearsay of the victim's statement that he was stabbed by a "black whore" was plain error. *Id.* at 500, 572 A.2d 983. The Court, however, found that the exclusion of this evidence did not implicate the fundamental fairness of the trial and declined "to characterize the error as constitutional." *Id.* 500–501, 572 A.2d 983. The Court reasoned that "[t]he acquittal on the murder charge indicates that the jury had reasonable doubt as to whether the defendant [Flanders] caused the death of the victim." *Id.* at 501 n. 5, 572 A.2d 983. Noting that the felony murder statute does not require that the defendant commit the homicidal act, the Court opined that the "excluded evidence is exculpatory only if it indicates that neither the defendant nor any participant in the felony caused the death." *Id.* at 501, 572 A.2d 983. The Court believed the identity of the killer was not exculpatory in Flanders' case "because there was a basis in the evidence for the jury reasonably to have found that Conaway was a participant in the felony." *Id.* Concluding that it was "highly unlikely that, if the testimony had been admitted into evidence, the jury would have reached a different verdict," the Court held the error harmless. *Id.* at 502, 572 A.2d 983.

The Court, moreover, found the other two grounds for Flanders' appeal to be without merit. Noting that a supplementary bill of particulars "is within the sound discretion of the trial court," the Court was "unable to find any prejudice against the defendant because of the trial court's denial of his motion." *Id.* at 503, 572 A.2d 983. Similarly, the Court found a general unanimity charge to be sufficient in felony murder cases because "[t]he statute does not provide conceptually distinct theories of liability based on which participant caused the death." *Id.* at

---

5. The record does not indicate what portion of the transcripts were read back to the jury. The testimony of Stanislaus Brzoska, however, appears to be the relevant excerpt:

Q: Okay, did you observe anything about Walter?
A: I didn't know then. I asked him what happened and then—and then he said that to this black—to this charnota, (phonetic) I was stabbed.

Q: All right. What do you understand that was meant by the Polish word, charnota?
A: That means it's black people. A black person. Black people.
THE INTERPRETER: I asked him, "Does that mean a black person or black people?" And he says, "Black people."
(10/27/87 Trans. at 88–89.)

288

505, 572 A.2d 983. Accordingly, the Court affirmed Flanders' felony murder conviction.[6]

On January 30, 1991, Flanders filed this Petition *pro se* alleging a violation of his Sixth Amendment right to a fair trial along with a request for permission to file the Petition *in forma pauperis* and a request for appointment of counsel. (*See* Petition, Filing No. 1.) The court granted permission to file *in forma pauperis* and directed the State to file an answer on or before March 1, 1991. (Order to Show Cause, Filing No. 2 (January 30, 1991).) On February 20, 1991, the case was referred to Magistrate Margolis for all proceedings. (Order of Ref., Filing No. 4.) On February 27, 1991, the State filed its answer to Flanders' Petition. (Ans., Filing No. 5.) On March 26, 1991, the Magistrate Judge appointed counsel to represent Flanders and directed counsel to file an amended petition. (Appt. of Counsel, Filing No. 9.) On July 29, Flanders filed an amended petition challenging the trial court's exclusion of allegedly exculpatory testimony that the victim was stabbed by the "black whore". The State filed an amended answer on September 9, 1991. (Amend. Petition, Filing No. 11; Amend.Ans. Filing No. 12 (hereinafter the "Petition").) Subsequently, the parties filed cross-motions for summary judgment. (*See* Pet.'s Mot.Sum.Judg., Filing No. 13; Resp.'s Cross–Mot.Sum.Judg., Filing No. 15.)

In a ruling filed, October 26, 1992, the Magistrate recommended that Flanders' motion for summary judgment be denied and that State's cross-motion be granted. Recommended Ruling, slip op. at 2. The Magistrate found that the exclusion of the testimony did not rise to a level of constitutional magnitude because the excluded testimony "does not create a reasonable doubt as to petitioner's guilt" on the felony murder charge. *Id.* at 11. Specifically, the Magistrate found that a review of the record supported the Connecticut Supreme Court's conclusion that a reasonable jury would have found that Conaway was a participant in the burglary. *Id.* The Magistrate reasoned that "[a]t best, the excluded evidence might have

created reasonable doubt in the minds of the jurors as to who actually killed Wladyslaw Brzoska, which reasonable doubt already existed by virtue of the jury having acquitted him on the murder charge." *Id.* Since the State "need only prove that the defendant or another participant caused the death of a person other than the participant" to establish liability under Connecticut's felony murder statute, the Magistrate concluded that the identity of the killer was immaterial to Flanders' conviction for felony murder. *Id.*

The Magistrate, moreover, rejected Flanders' claim that the excluded testimony precluded him from raising an affirmative defense. The Magistrate found that "there [was] no evidence that [Flanders] sought to raise any of the statutory affirmative defenses at trial." Accordingly, the Magistrate concluded that Flanders' argument was "simply too attenuated to convince this court that petitioner has been afforded a fundamentally unfair trial." (*Id.* at 12.)

On November 16, 1992, Flanders filed this objection to the Magistrate's Recommended Ruling. On Monday, March 29, 1993, the court held oral argument on Flanders' objection.

### Standard of Review

■ The court reviews a magistrate's recommended ruling *de novo.* Rule 72(b), Fed. R.Civ.P., dictates that the court "shall make a *de novo* determination ... of any portion of the magistrate's disposition to which specific written objection has been made." *See also* 28 U.S.C. § 636(b)(1); *United States v. American Soc'y of Composers, Authors, and Publishers,* 739 F.Supp. 177, 179 (S.D.N.Y. 1990). A *de novo* review does not require an additional evidentiary hearing, "but may be based solely upon the record." *Id.* at 179–80 (citing Rule 72(b), Fed.R.Civ.P.). After conducting its review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1).

---

**6.** Flanders filed a timely petition for a writ of certiorari in the United States Supreme Court following his direct appeal to the Connecticut

Supreme Court. The petition was denied October 9, 1990. *Flanders v. Connecticut,* 498 U.S. 901, 111 S.Ct. 260, 112 L.Ed.2d 217 (1990).

## Discussion

As a preliminary matter, the State concedes and the Connecticut Supreme Court has determined that the exclusion of Jan Brzoska's testimony was plain error. The folly of the trial court's evidentiary ruling, therefore, is not in issue.[7] *Cf. Chambers v. Mississippi,* 410 U.S. 284, 294–303, 93 S.Ct. 1038, 1045–50, 35 L.Ed.2d 297 (1973) (exclusion of testimony on hearsay grounds violated defendant's right to a fair trial despite finding by state's highest court that trial court's exclusion did not contravene the state's rules of evidence).

The finding of error, however, does not end the inquiry. "Erroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.), *cert. denied,* 464 U.S. 1000, 104 S.Ct. 503, 78 L.Ed.2d 694 (1983). Rather, the court will issue the writ "*only* where petitioner can show that the error deprived [him] of a *fundamentally fair* trial." *Id.* (emphasis in original) (citations omitted). Accordingly, the issue presented in the Petition is whether the exclusion of the testimony was an error of constitutional magnitude that violated Flanders' right to a fair trial under the Sixth and Fourteenth Amendments.

### A. Constitutional Error Standard

■ As the Second Circuit has noted on several occasions, "[t]he concept of 'fundamental fairness' is an elusive one." *Taylor,*

708 F.2d at 891; *see also Collins v. Scully,* 755 F.2d 16, 18 (2d Cir.1985). Where the claim implicates the erroneous exclusion of evidence, the court must determine whether the excluded evidence was *material* to the presentation of the defense. *Taylor,* 708 F.2d at 891. Erroneously excluded evidence is material and rises to the level of constitutional error "if the omitted evidence would have created a reasonable doubt that did not otherwise exist...." *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976); *accord Scully,* 755 F.2d at 18; *United States v. Cody,* 722 F.2d 1052, 1062–63 (2d Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984); *Taylor,* 708 F.2d at 891. Accordingly, in determining whether the erroneous exclusion of testimony rises to the level of constitutional error, the court evaluates "what the impact of the excluded evidence would have been if it had been admitted." *Scully,* 755 F.2d at 18.

■ The omitted evidence, moreover must be evaluated in the context of the entire record. *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402; *see also Taylor,* 708 F.2d at 891. "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." *Id.* Conversely, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.*[8]

7. In its ruling, the Connecticut Supreme Court appears to treat the exclusion of the testimony under the spontaneous utterance exception to the hearsay rule. *See Flanders,* 214 Conn. at 496, 572 A.2d 983. Flanders contends that the statement was also admissible as a dying declaration and under the catch-all exception to the hearsay rule. (*See* Brief of Defendant–Appellant to the Supreme Court of Connecticut, No. 13344 (March 9, 1989) at 17–21.) Because the State conceded on appeal that the exclusion was error, the Supreme Court did not specify the basis for its finding that the exclusion constituted error. *See Flanders,* 214 Conn. at 500, 572 A.2d 983. The State, moreover, does not challenge the Supreme Court's finding that the exclusion of the testimony was error in its opposition to Flanders' Petition. Finally, in light of settled law that the hearsay rule should not be applied mechanistically to preclude a jury from considering vital

evidence of a criminal defendant's innocence, *see Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), a finding that the excluded evidence was material to Flanders' defense would likely render the testimony admissible irrespective of Connecticut's hearsay rule. *See Rivera v. Director, Dept. of Corrections,* 915 F.2d 280, 281, 283 (7th Cir. 1990) (Posner, J.). Accordingly, the court need not determine the precise basis for the Supreme Court's finding of error.

8. A court's determination of whether or not the erroneous exclusion of evidence is an error of constitutional magnitude is not to be confused with the narrower inquiry of whether a constitutional error is harmless beyond a reasonable doubt under the standard articulated by the United States Supreme Court in *Chapman v. California,* 386 U.S. 18, 22–42, 87 S.Ct. 824, 827–837,

## B. *Application*

▮ In his Petition, Flanders contends that the exclusion of Jan Brzoska's testimony precluded the jury from hearing material, exculpatory evidence and thereby compromised the integrity of the fact finding process. Specifically, Flanders argues that the jury considered the felony murder charge against him exclusively on the theory that *he* killed the victim in the course of and in furtherance of his *own* burglary. Under such a theory of the case, excluded testimony concerning the identity of the killer would be material and exculpatory. Flanders contends, moreover, that the preclusion of the testimony prevented the jury from considering his liability under the felony murder statute, on the alternative theory that Conaway, not Flanders, stabbed the victim. Flanders reasons that to convict him of felony murder as a co-participant in a killing committed by Conaway the jury would have to find: (1) that Conaway was a *participant* in Flanders' burglary; (2) that in her capacity as a participant, Conaway killed Wladyslaw in the course of that burglary; and (3) that Conaway killed the victim in furtherance of that burglary. Flanders asserts that a rational jury could find reasonable doubt as to the existence of any one or all of these elements required to establish his guilt as a co-participant in Conaway's killing. In the absence of any direct evidence implicating Conaway in the killing, moreover, Flanders insists that a rational jury would never have considered the elements required to establish co-participant liability in this one-defendant case. He concludes, therefore, that the erroneous exclusion of testimony irrevocably compromised the fundamental integrity of the jury's fact finding process in this case.

In response, the State contends that the excluded evidence was immaterial to Flanders' conviction under the Connecticut felony murder statute. The State concedes that had the jury convicted Flanders for murder in the first degree, the excluded testimony

would be exculpatory and material to *that* conviction. The State points out, however, that Flanders was acquitted of first degree murder but convicted of felony murder and burglary in the second degree, convictions it contends render the actual identity of the killer irrelevant. Specifically, the State argues that there was ample evidence to convict Flanders under either a single participant or co-participant theory of felony murder, both of which it contends were in this case. The State notes that neither the parties nor the court are free to speculate as to which theory underlies the jury's verdict. The State posits, moreover that at best, Flanders' Petition raises issues concerning the interpretation of the felony murder statute, issues of Connecticut law that are not properly before this court on a petition for a writ of habeas corpus. Relying on both the Connecticut Supreme Court's ruling in *Flanders* and the Magistrate's Recommended Ruling on this Petition, the State concludes that it simply does not matter whether James Flanders or Annette Conaway killed Wladyslaw Brzoska in order to affirm Flanders' felony murder conviction. The court disagrees.

### 1. *Single Participant Theory*

At the outset, the court notes the obvious: if the jury convicted Flanders on the belief that *he*, acting alone, killed the victim in the course of and in furtherance of his own burglary, testimony indicating that somebody else did the killing is exculpatory and material. This observation, moreover, is not diminished by Flanders' acquittal on the charge of first degree murder. It would be entirely consistent in this single defendant prosecution for the jury to conclude that Flanders lacked the requisite *mens rea* to have committed murder in the first degree, but, nonetheless, killed Wladyslaw in the course of and in furtherance of his own burglary. Regardless, therefore, of Flanders' acquittal on first degree murder, the exclusion of evidence

---

17 L.Ed.2d 705 (1967). *See Taylor,* 708 F.2d at 891, n. 6. In cases, such as this one, where the alleged constitutional error is the deprivation of the fundamental right to a fair trial, the finding of an error that deprives the defendant of his constitutional right to a fair trial cannot by defi-

nition be harmless. Accordingly, the court's broader inquiry into the constitutional dimensions of an erroneous exclusion of evidence subsumes the harmless error analysis and obviates the need for any additional inquiry under *Chapman.*

that somebody else killed the victim is no less material to a finding that Flanders killed in the course and furtherance of his own burglary.

A review of the record, moreover, provides some support for the view that the jury did indeed convict Flanders on such a single participant theory of felony murder. First, the State prosecuted Flanders alone. Thus, the jury considered felony murder liability in the context of a single defendant prosecution, rather than the multiple defendant prosecutions that often accompany a co-participant theory of felony murder. *Cf., e.g., State v. Fleming*, 198 Conn. 255, 257, 502 A.2d 886, *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986).

Second, the prosecutor acknowledged during the trial proceedings that he was not going to argue that "she [Conaway] is a co-participant...." (10/28/93 Trans. at 22.) Instead, he argued repeatedly to the jury that Flanders alone killed Wladyslaw and that there was no evidence that Conaway was involved in the killing. (*See* Trans. at 1084–87, 1091, 1142, 1148.) Indeed, at one point during the argument the prosecutor told the jury bluntly:

> Now, the State is claiming that it is reasonable to infer from the defendant having been inside and from evidence that I'm going to mention later that Wladek· surprised that guy [Flanders] in the apartment and that James Flanders took the kitchen knife and he stabbed Wladek. .* * * Now, that's the State's theory as to what happened in that apartment.

(11/6/87 Trans. at 1086). Furthermore, four other prosecution witnesses testified that Flanders admitted that *he* alone stabbed the victim. *See Flanders*, 214 Conn. at 498–499, 572 A.2d 983. Thus, the State argued its case to the jury on the theory that Flanders, acting alone, killed Wladyslaw.

Third, the jury instructions failed to differentiate between the single participant and co-participant liability. Indeed, the court denied Flanders' request to charge on the separate theories of felony murder. (11/6/93 Trans. at 1073–74.) Thus, the jury instructions contained nothing to counter the State's submission of its case to the jury under a single participant theory.

Fourth, contrary to the State's assertion that Flanders was on notice that the co-participation theory of felony murder was technically in the case, the issue of whether co-participant felony murder liability was before the jury reared its head throughout the proceedings and was the source of numerous pretrial, trial, and post trial motions by the defense, all of which were denied. (*See, e.g.*, 10/16/87 Trans. at 33 (denying motion for a supplemental bill of particulars); 10/28/87 Trans. at 30 (denying motions for judgment of acquittal on felony murder and motion for a substituted information); 11/7/87 Trans. at 1080 (denying renewed motions for judgment of acquittal on felony murder and for a substituted indictment); 11/7/87 Trans. at 1072 (denying defendant's request to charge on separate theories of felony murder).) The record suggests, therefore, that a significant issue existed at the time the case was submitted to the jury as to whether co-participant liability was properly before the jury during its deliberations.[9]

Finally, the court finds unpersuasive the bald assertion contained in the Connecticut Supreme Court's ruling, subsequently adopted by the Magistrate, that "[t]he acquittal on the murder charge indicates that the jury had reasonable doubt as to whether the defendant caused the death of the victim." *Flanders*, 214 Conn. at 501, n. 5, 572 A.2d 983; Recommended· Ruling, slip op. at 11 ("reasonable doubt [as to who killed victim] already existed by virtue of the jury having acquitted him on the murder charge"). The court finds nothing in the record to support such a conclusion and there

---

9. The court offers no view on whether the trial court's denial of these motions was proper. Flanders' challenge to these rulings were denied on appeal by the Connecticut Supreme Court. *See Flanders*, 214 Conn. at 503–505, 572 A.2d 983. Since the denial of those motions was pursuant to Connecticut law, the court considers itself· bound by the Connecticut Supreme Court's ruling. Flanders, moreover, does not challenge the sufficiency of those denials in his petition. Accordingly, the court considers the denials· of those motions only in the context of its established duty to review Flanders' Sixth Amendment claim in light of the entire record.

were no jury interrogatories to indicate the basis for the jury's verdict. As noted earlier, there is significant support in the record for the view that the jury was operating on the theory that Flanders, alone, killed the victim, but did so *unintentionally*, in the course and furtherance of the burglary.[10]

### 2. *Co-participant Theory*

Admittedly, the mere possibility that the jury premised its felony murder conviction on the theory that Flanders killed Wladyslaw in the commission of his burglary, is not dispositive of constitutional dimensions of the trial court's error. The court recognizes that the material and exculpatory impact of the excluded testimony cannot be evaluated exclusively from the perspective that Flanders, acting alone, killed Wladyslaw. Accordingly, the court next considers what impact, if any, the admission of the testimony would have on the jury's ability to consider Flanders' guilt as a co-participant in a killing committed by Conaway.

Connecticut's felony murder statute, Conn. Gen.Stat. § 53a–54c provides in relevant part:

A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary ... and in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

Under a co-participant theory of felony murder liability, therefore, a jury must find: (1) the killer, as well as the co-participant defendant[s], was a "participant" in the underlying felony; (2) the killer killed the victim in the course of *and* in furtherance of that underlying felony; or (3) the killer killed in the flight from that felony.

The State's central contention throughout the post-conviction proceedings is that the identity of the killer was irrelevant to any of the elements required to establish a co-participant theory of felony murder in this case. Relying on the Connecticut Supreme Court's view that the excluded testimony "further establishes her [Conaway's] joint participation in the events ... of September 21, 1986," *Flanders,* 214 Conn. at 502, 572 A.2d 983, the State contends that sufficient evidence existed for the jury to find beyond a reasonable doubt that Conaway was a participant in Flanders' burglary. The State reasons that by virtue of her status as a participant in Flanders' burglary, the jury need not decide whether Flanders or Conaway killed Wladyslaw because Flanders would be guilty of felony murder even if the jury concluded that Conaway killed Wladyslaw. The State concludes that evidence demonstrating that Conaway, not Flanders, killed Wladyslaw fails to create any doubt as to Flanders' guilt as a co-participant in Conaway's murder and, therefore, is immaterial to his conviction for felony murder.

---

**10.** The court does not consider itself bound by the Supreme Court's belief that reasonable doubt already existed as to whether Flanders stabbed Wladyslaw by virtue of the jury's acquittal on the first degree murder charge. Such a conclusion would best be characterized as a mixed issue of fact and law to which the deference accorded state courts does not apply. *See Sumner,* 449 U.S. at 546–547, 101 S.Ct. at 768–769. Even if the court found that the Connecticut Supreme Court's assertion could be interpreted as an implied finding of fact or a factual inference to be drawn from historical facts, moreover, the court would not accord deference to such a finding as it is not "'fairly supported' by the record as a whole." *Ventura,* 957 F.2d at 1054. Indeed, at oral argument, even the state was mystified as to how the Connecticut Supreme Court could have logically reached such a conclusion. (*See Flanders v. Meachum,* 2:91CV00087 (AHN) Hearing on Defendant's Objection to Magistrate's Ruling (March 29, 1993), Trans. at 40.)

After reviewing the record, the court disagrees. The issue, moreover, is more complex than simply whether or not Conaway was a participant in Flanders' burglary. Even the issue of Conaway's status as a participant is not nearly as straightforward as the State would have this court believe. Accordingly, in light of the record in this unusual case, the court finds it helpful to review the elements required to establish Flanders' guilt as a co-participant in a felony murder committed by Conaway.

### a. *Conaway's Participation in the Burglary*

The underlying felony charged in this case was burglary in the second degree. Conn. Gen.Stat. § 53a–102 provides: "A person is guilty of burglary in the second degree when he enters or remains unlawfully in a dwelling at night with intent to commit a crime therein." Neither the felony murder statute, nor the Connecticut Supreme Court define the term "participant" as it is used in the felony murder statute. *See* Conn.Gen.Stat. § 53a–54c. The Court has stated, however, that "§ 53a–54c contemplates more than mere passive acquiescence in a crime by the 'participants,' requiring the intent to commit the underlying felony upon which the felony murder charge is predicated." *State v. Simms*, 201 Conn. 395, 418, 518 A.2d 35 (1986). Furthermore, in reference to the requirement that the victim may not be a "participant" in the underlying felony in order to establish a felony murder, the trial court in this case instructed the jury that a participant "is defined as one who takes part or shares in the underlying crime." (Trans. at 1181.) Thus, it would appear from the jury instructions, as well as the applicable case law, that some type of criminal liability in the underlying felony is required to establish participant status in a felony murder prosecution involving multiple participants. *See generally, State v. Toomey*, 38 Wash. App. 831, 690 P.2d 1175, 1181 (1984) (participant, as used in statute virtually identical to Connecticut's felony murder statute, "means another person involved in the crime—i.e., another principal or accomplice"), *cert. denied*, 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 501 (1985); *see also Simms*, 201 Conn. at 417–418, 518 A.2d 35 (trial court

gave proper instruction when it "elaborated upon the words 'other participants' by express reference to accessory statute, General Statutes § 53–8"); *Fleming*, 198 Conn. at 271, 502 A.2d 886 (jury instruction on accessorial liability is proper where defendant was charged with felony murder for accessorial role in underlying felony).

The record establishes that Conaway could not have been a "participant" in Flanders' burglary under a principal theory of liability. Indeed, the record is conclusive and the State does not contest that Conaway was invited up to Brzoska's apartment and remained on the premises lawfully. *See Flanders*, 214 Conn. at 497, 572 A.2d 983. In light of her lawful presence on the premises, it follows that Conaway could incur liability for second degree burglary, the underlying felony in this case, only under something akin to an accessory theory. Accordingly, in order to properly consider Conaway's status as a "participant" as that term applies in § 53a–54c, the jury would have to consider whether the evidence established that Conaway was an accomplice or accessory to Flanders' burglary.

It is settled law in Connecticut that accomplice liability "requires proof of dual intent: 'that the accessory have the intent to *aid* the principal *and* that in so aiding [she] intend to *commit* the offense with which [she] is charged.'" *Fleming*, 198 Conn. at 271, 502 A.2d 886 (emphasis original) (quoting *State v. Harrison*, 178 Conn. 689, 694, 425 A.2d 111 (1979); *State v. Nardini*, 187 Conn. 513, 531, 447 A.2d 396 (1982)); *see also* Conn.Gen.Stat. § 53a–8. To establish accessory liability, moreover, "'the state must prove criminality of intent and *community* of unlawful purpose.'" *Simms*, 201 Conn. at 418, 518 A.2d 35 (quoting *State v. Teart*, 170 Conn. 332, 334–336, 365 A.2d 1200 (1976)). The inquiry into Conaway's status as a "participant" in Flanders' burglary, therefore, requires a dual determination by the jury: (1) that Conaway intended to aid Flanders in *his* burglary; and (2) that *she* intended to commit burglary.

After reviewing the record, the court is concerned that a reasonable jury would not conduct an inquiry into Conaway's status as

an accessory in Flanders' burglary. As discussed earlier, the State never argued that Conaway was a participant in Flanders' burglary under either a principal or accessorial theory of liability. During closing argument, the State highlighted Conaway's testimony that she never invited Flanders into the apartment. There was direct evidence, moreover, of an altercation between Conaway and the victim concerning Conaway's refusal to complete a sex for money transaction, a venture distinct from the underlying burglary charged in the felony murder count. Finally, the State never sought to prove nor argued to the jury that Conaway was a participant in any capacity, let alone establish the dual intent required to prove her accessorial liability in Flanders' burglary.

For its part, the trial court never instructed the jury on the elements of accessorial liability under Conn.Gen.Stat. § 53a–8. Judge Ripley made only one reference to the meaning of the term "participant" and this was in the context of the felony murder statute's requirement that the victim have no criminal role in the underlying burglary. The jury instructions, moreover, are devoid of any reference to Conaway's role as a possible participant in Flanders' crimes. While "[a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies," a court may consider that charge "as to its probable effect upon the jury in guiding them to a correct verdict in the case." *State v. Allen,* 216 Conn. 367, 387, 579 A.2d 1066 (1990) (citations omitted). Accordingly, the fact that the jury received no formal instructions on accessory liability deepens the court's concern that the jury did not consider the elements required to establish Conaway's status as a "participant." [11]

Admittedly, the record contains some evidence of a relationship between Conaway and Flanders: Flanders' interpretation of Conaway's wave prior to her entering the apartment as a signal to come along; Conaway's testimony that she saw Flanders in the apartment attempting to lift the television; and Conaway's explanation that she was not surprised by Flanders' presence in the apartment because "[w]e was hustling together." In relying exclusively on this evidence, however, as a basis for its conclusion that the "jury could reasonably have found that Conaway was a participant," the Connecticut Supreme Court never addressed whether a reasonable jury would logically consider that evidence from the perspective of Conaway's role as an accomplice under § 53a–8 in *Flanders'* burglary. Indeed, the Supreme Court never discussed Conaway's role in the burglary in an accessorial capacity at all and instead chose to characterize her status in generic terms as one of "joint participation in the events that occurred in the early morning hours of September 21, 1986." *Flanders,* 214 Conn. at 502, 572 A.2d 983.

The court recognizes that the less than ideal consideration given to Conaway's status as a "participant" in Flanders' burglary is not, by itself, dispositive of Flanders claim that the exclusion of evidence was an error of constitutional magnitude. It does suggest, however, that the issue of Conaway's status as a participant, a prerequisite to finding Flanders guilty of felony murder under a co-participant theory, is far less straightforward than the State would have this court believe. In light of the problems that surrounded the felony murder count throughout the trial,

---

11. Flanders contends that the trial court's failure to give a charge on aiding and abetting indelibly taints his conviction. He argues that despite the absence of any direct Connecticut law requiring the giving of an aiding and abetting instruction in a felony murder case such as this, the Connecticut Supreme Court's rulings in *State v. Enanno,* 96 Conn. 420, 114 A. 386 (1921), *Fleming,* and *Simms,* when taken together, require the giving of an accessorial liability instruction under Connecticut law. To the extent that Flanders invites this court to adopt such an interpretation of Connecticut law and grant his writ on this ground alone, the court respectfully declines.

In offering no opinion as to whether Connecticut law requires the giving of a jury charge that references § 53a–8, the accessory liability statute, however, the court believes that the failure of the trial court to give such an instruction is relevant to the court's more general inquiry into the impact of the erroneously excluded evidence on the jury's verdict. The court, therefore, considers the absence of such an instruction in the context of its well established obligation to evaluate the materiality of the excluded evidence in light of the entire record.

moreover, the fact that the crucial issue of Conaway's status was glossed over is simply another indication that Flanders' conviction for felony murder as a co-participant in a killing committed by Conaway is of questionable validity.

### b. *In the Course and Furtherance of the Felony*

■ To convict a person of felony murder in Connecticut, § 53a–54(c) requires that one of participants in the underlying felony cause the death of the victim "in the course and furtherance of such crime or flight therefrom...." "The phrase 'in the furtherance of such crime' imposes the requirement of a logical nexus, that is a connection between the underlying felony and homicide." *Allen*, 216 Conn. at 387, 579 A.2d 1066 (1990). The mere fact that a homicide coincides in time and place with an underlying felony is not sufficient to create liability for felony murder in Connecticut. *Id.* Rather:

> The nexus or connection must be one of logic or plan. This means that the felony murder statute excludes those deaths which are so far outside the plan of the felony and its execution as to be unrelated to that. In other words, a felony murder does not include any killing incidentally committed with the felony but only includes those felonies in the attempted execution of the felony of burglary.... Although the homicide itself need not be in the common design, the act which results in death must be in furtherance of the unlawful purpose.

*Id.* at 387–388, 579 A.2d 1066. The Connecticut Supreme Court, moreover, has gone so far as to state: "the 'in furtherance of' phrase in § 53a–54c was designed to limit the liability of a person whose accomplice in one of the specified felonies has committed the homicidal act to those circumstances that were contemplated by the parties to the undertaking." *Simms*, 201 Conn. at 417, 518 A.2d 35. Accordingly, the court next evaluates the impact of the excluded evidence on the sufficiency of a logical nexus between Flanders' burglary and the homicide.

The felony murder conviction in this case was predicated on Flanders' conviction of burglary in the second degree. Flanders does not contest the sufficiency of this burglary conviction. If the jury believed that Flanders killed Wladyslaw, it follows that a reasonable jury would conclude that Flanders killed the victim in the course and furtherance of his own burglary. Not surprisingly, this was the theory argued by the State to the jury:

> Wladek surprised that guy [Flanders] in the apartment and that James Flanders took the kitchen knife and he stabbed Wladek.
>
> \*    \*    \*    \*    \*    \*
>
> What I'm suggesting to you is that James Flanders was in that place to steal. Whether it was to steal the television set, whether it was to steal something else, I'm suggesting to you he was in there to steal, and that he got caught in the act, and that was the only way to get out, as he later admitted to somebody.

(11/6/87 Trans. at 1086, 1087). Thus, the establishment of a logical nexus between the underlying felony and the homicide in this case flows directly from the evidence that Flanders killed Wladyslaw.

If the identity of the killer shifts to Conaway, however, a non-defendant in this single defendant prosecution, the connection between the homicide and the underlying burglary becomes more attenuated. Even if sufficient evidence exists for a reasonable jury to conclude that Conaway participated in a joint plan to commit a burglary with Flanders, the jury would still have to conclude that Conaway killed Wladyslaw during the course and in furtherance of that burglary.

The evidence introduced at trial, however, points to the contrary. The record indicates that Wladyslaw and Conaway were involved in an argument over Conaway's refusal to perform sex after receiving $20 from Wladyslaw. Wladyslaw and Conaway went into the kitchen where Wladyslaw gestured that he would stab Conaway if she did not return the money or honor her end of the bargain. To convict Flanders of felony murder as a co-participant, the jury would have to conclude from this evidence that Conaway killed Wladyslaw in connection with Flanders' burglary

rather than in furtherance of her own sex for money scam.

A rational jury, moreover, would have to reach this conclusion, notwithstanding that: (1) the State never charged Conaway with this or any other crime relating to this incident; (2) the State never argued to the jury that she committed a crime; and (3) the State categorically denied making any deal with Conaway, the only living witness who actually saw Flanders in the apartment, in exchange for her cooperation in the investigation. A review of the entire record, therefore, suggests, not only that a rational jury could find reasonable doubt as to the requisite linkage between Conaway's homicide and Flanders' burglary, but that a jury would not even consider this issue in the absence of any direct evidence that Conaway, rather than Flanders, killed Wladyslaw.

Similarly, the identity of the killer was material to the jury's consideration of whether Flanders' burglary terminated prior to the commission of the homicidal act. Conaway testified that she saw Flanders in the apartment at only one time during her visit to the apartment, when she was in the bedroom with both Brzoska brothers. At no time following that did she see Flanders; not when she and Wladyslaw went into the kitchen; and not when she left the apartment. Conaway further testified that she waited nearly an hour for Flanders after she left the apartment before going home. For his part, Flanders testified that he left the apartment shortly after he entered. A rational jury operating under the theory that Conaway was the killer, could only find the requisite linkage between the homicide and the burglary by considering: (1) whether Flanders left the apartment prior to Conaway's killing of Wladyslaw; and, if so, (2) whether *Flanders'* burglary terminated prior to the homicide in order to conclude that Conaway killed Wladyslaw during the course of and in furtherance of the underlying felony. The court believes that had the jury conducted such an inquiry, an inquiry that would be necessary only if it were confronted with evidence sufficient to conclude that Conaway was the killer, a basis for finding reasonable doubt would

exist as to whether Conaway killed Wladyslaw in furtherance of Flanders' burglary.

The existence of reasonable doubt, moreover, would not be diminished by the jury's finding that Conaway killed the victim in connection with the attempt to steal from the Brzoska's apartment. As long as Flanders had left the premises prior to the killing, any attempt by Conaway, herself, to steal from the Brzoska's apartment would make her a principal rather than an accessory in the underlying crime. Conaway, however, by virtue of the fact that she was on the premises lawfully, would be committing larceny, not burglary, a crime that is not one of the statutory predicate crimes to felony murder in Connecticut. *See* Conn.Gen.Stat. § 53a–54c; *cf. also,* Conn.Gen.Stat. § 53a–102 (burglary statute) *with* § 53a–119 (larceny statute). Under this scenario, a reasonable jury could conclude that Conaway killed in the course and furtherance of *her own larceny,* not as an accomplice in Flanders' burglary. Once again, the identity of the killer would be material to a determination by the jury that the homicide was committed during the course and in furtherance of the underlying felony in this case.

### 3. *Credibility of the Prosecution's Witnesses*

Flanders argues that the impact of the trial court's error was material not only to the jury's consideration of the co-participation theory of felony murder liability in this case but also to the credibility of the prosecutions' witnesses. Flanders contends that the excluded evidence linking Conaway to the murder of Wladyslaw established a direct motive for Conaway and the witnesses associated with her to lie. Flanders argues that the jury *had* to believe Conaway, as well as the other prosecution witnesses' testimony that Flanders admitted committing the homicidal act, in order to convict him of felony murder in this case. Flanders concludes that the exclusion of evidence linking Conaway to the homicide interfered with the defense's ability to impeach the credibility of key prosecution witnesses and, therefore, tainted the jury's evaluation of those witnesses. The court agrees.

In evaluating the impact of the excluded evidence on Flanders' defense, the court turns to *Rosario v. Kuhlman*, 658 F.Supp. 1408 (S.D.N.Y.1987) (Knapp, J.), *aff'd*, 839 F.2d 918 (2d Cir.1988). *Rosario* held that a trial court's erroneous exclusion of testimony from an unavailable witness that attacked the credibility of the prosecution's lone identifying witness in a murder trial constituted constitutional error. Specifically, the court stated:

> [W]e find it simply frivolous to attribute immateriality to testimony which would have entitled the jury to find that the only identifying witness (an habitual criminal who was himself a possible suspect) had resorted to perjury to explain his presence at the scene of the crime.

*Rosario*, 658 F.Supp. at 1413. On appeal, the Second Circuit affirmed and concluded that after a review of the record, the admission of the impeaching testimony "*could* have created a reasonable doubt that did not otherwise exist...." *Rosario*, 839 F.2d at 927. *Rosario*, therefore, suggests that erroneous evidentiary rulings that exclude defense testimony that directly contradicts and implicates the credibility of testimony from key prosecution witnesses can, in certain cases, rise to the level of constitutional error.

While *Rosario* is distinguishable on its specific facts, the court finds its rationale particularly applicable in this case. Here, Conaway's testimony was crucial to the State's prosecution of Flanders. Conaway's testimony was crucial not only to establishing that Flanders killed Wladyslaw, the theory propounded by the State, but to the jury's consideration of whether Wladyslaw's death occurred as the result of the burglary or whether it resulted from Conaway's sex for money scam. The exclusion of the evidence precluded the jury from fairly evaluating the credibility of Conaway's testimony, testimony material to the State's case.

More importantly, direct evidence implicating Conaway in the homicide, contradicts the testimony of the prosecution witnesses who testified that *Flanders* admitted to stabbing Wladyslaw. The excluded evidence, moreover, was material to Flanders' ability to establish a motive to impeach the credibility of those witnesses, three of whom were associates of Conaway. Eddie Rose Jr., who testified that Flanders admitted he had to "jug" the victim with a knife in a telephone conversation, was Conaway's live-in boy friend at the time of the incident. An allegation that Conaway killed Wladyslaw for money, the proceeds of which might benefit Rose, could implicate him in Conaway's sex for money fraud. Lois Brown, who testified that Flanders also admitted to her that he stabbed the victim, had a similar reason to fear Rose's implication in the incident. Specifically, she is the mother of Rose's five year-old son and his live-in girlfriend at the time of trial. Finally, Shirley Williams, who testified that Flanders' admission to her occurred during an encounter on the street shortly after the time of the incident, never went to the police. Rather, the police contacted Williams only after learning about her alleged encounter with Flanders from Conaway and Rose. Accordingly, the court believes that the trial court's exclusion of evidence that Conaway stabbed Wladyslaw precluded the jury from considering probative evidence that contradicted, as well as impeached the credibility of the prosecution witnesses who identified Flanders as the murderer.

## C. *Right to a Fair Trial*

It has been written in this district that " 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.' " Magistrate's Recommended Ruling, slip op. at 13 (quoting *Person v. Meachum*, 772 F.Supp. 69, 77 (D.Conn.1991) (Cabranes, C.J.), *aff'd*, 962 F.2d 1 (2d Cir.1992)). After a careful review of record, the court concludes that James Flanders received neither.

"The right to present a defense is one of the 'minimum essentials' of a fair trial." *Rosario*, 839 F.2d at 924 (quoting *Chambers*, 410 U.S. at 294, 93 S.Ct. at 1045). The erroneous exclusion of testimony implicating Conaway in the killing deprives Flanders of this essential component of a fair trial. The trial court's exclusion of Wladyslaw's statement prior to his death precluded the jury from considering evidence that could have created a reasonable doubt as to Flanders'

guilt of felony murder under either theory of liability. The evidence, therefore, was material to Flanders' liability on felony murder and its exclusion compromised the fact finding process in a manner that offends this court's concept of fundamental fairness.

In so ruling, the court finds only that the excluded evidence materially compromised the integrity of the jury's fact finding process. The court offers no opinion as to whether a reasonable jury, nonetheless, would have convicted Flanders of felony murder based upon a full evidentiary record that included the excluded testimony. Nor does Flanders argue that his conviction is invalid because the evidence presented at trial was constitutionally insufficient. Accordingly, the court's ruling today does not implicate the double jeopardy clause and will not preclude the State from retrying Flanders on the felony murder charge should it so choose. *See, e.g., Rivera v. Director Dept. of Corrections,* 915 F.2d 280 (7th Cir.1990) (Posner, J.) (exclusion of co-defendant's confession as hearsay violated defendant's due process right to a fair trial and entitled defendant to a new trial); *but cf. Fagan v. Washington,* 942 F.2d 1155, 1157 (7th Cir.1991) (Posner, J.) (granting of habeas relief on the grounds that evidence was "constitutionally insufficient" to convict defendant of murder on theory of accountability bars state from retrying defendant for that charge under the double jeopardy clause).

The court, moreover, is acutely aware of the implications of issuing a writ of habeas corpus for a defendant convicted of felony murder. The responsibility is heightened even further in a case, such as this one, where the conviction was affirmed by the State's highest court. In shouldering that responsibility, however, the court is mindful that "[t]he very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris v. Nelson,* 394 U.S. 286, 294, 89 S.Ct. 1082, 1088, 22 L.Ed.2d 281 (1969). The court, therefore, notes "what has been truly said of the federal writ: 'there is no higher duty than to maintain it unimpaired.'" *Smith v. Bennett,* 365 U.S. 708, 713, 81 S.Ct. 895, 898, 6 L.Ed.2d 39 (1961) (quoting *Bowen v. Johnston,* 306 U.S. 19, 26, 59 S.Ct. 442, 446, 83 L.Ed. 455 (1939).

The responsibility for this matter, however, does not rest solely with this court. To begin with, the court cannot understand why the State chose to charge only Flanders with a crime in this matter. If the State truly believed, what it now asks this court to accept, that James Flanders may have been a co-participant in Annette Conaway's felony murder of Wladyslaw, the State should have charged Conaway along with Flanders.[12]

Second, the trial court's exclusion of admissible, probative, and exculpatory testimony on the basis of a hearsay objection from a prosecutor who had previously introduced what he believed to be incriminating testimony from an identical source is, at best, mystifying. The law is clear: the "hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049. Indeed, "the due process clause entitles a criminal defendant to demand, *irrespective of the state's hearsay rule,* a trial 'adequate to separate the guilty from the innocent.'" *Rivera,* 915 F.2d at 281 (citation omitted) (emphasis added). As long as *Chambers* remains the law of this land, a judge cannot refuse to admit exculpatory evidence "without giving a better reason than that it is hearsay." *Id.* at 280–281. In light of this fundamental tenet of due process, therefore, the compounding of that error by the prosecutor's statement to the jury that the State had no evidence that Conaway was the killer when he knew such a statement to be patently false is, in this court's opinion, inexcusable and offensive.

Third, and possibly more troubling, is the fact that despite the egregious nature of the error itself, the trial court could have rectified or minimized its impact, at numerous

---

12. In making this observation, the court does not seek to impose its judgment on the State's implicit prosecutorial power and discretion to charge who it wants, when it wants, within the constraints of the law. The court believes the observation relevant only to the extent that the proper exercise of that discretion, nonetheless, significantly compounded the impact of excluding direct testimony that Conaway was the killer in this one defendant prosecution.

points throughout the proceedings. In particular, the issue of whether the co-participant theory of felony murder applied in this trial arose prior to the commencement of the trial and reared its head throughout the trial proceedings. The trial court had ample opportunity to put that issue to rest either by granting any one of the numerous motions addressed to it by the defense or simply instructing the jury accordingly. Had the trial court taken such action, this court sincerely believes that it would not be left in the uncomfortable position that it finds itself in today.

Finally, the court cannot understand, in light of this trial record, why the Connecticut Supreme Court did not remand this case for a new trial at a time more proximate to the incident in issue. To be clear, this court has nothing but the most profound respect for Connecticut's Supreme Court, a court with a long tradition of maintaining the highest standards of justice. The court believes, however, that no standard of deference nor comity can overcome the pungency that emanates from this trial record. Because "habeas corpus is an extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of ... federalism," *Hensley v. Municipal Court, San Jose Milpitas J.D., Cal.*, 411 U.S. 345, 351, 93 S.Ct. 1571, 1574–1575, 36 L.Ed.2d 294 (1973), and because this is a unique and extraordinary case that deeply offends this court's sense of fair play and justice, the court declines to follow the Connecticut Supreme Court and grants Flanders' Petition for a writ of habeas corpus.

### Conclusion

For the reasons stated above, the court DECLINES to adopt the Magistrate's Recommended Ruling. Flanders motion for summary judgment [Filing No. 13] is GRANTED and the State's cross-motion for summary judgment [Filing No. 15] is DENIED. Flanders' Amended Petition for a Writ of Habeas Corpus [Filing No. 11] is GRANTED and the court orders Flanders released from state custody that derives from his conviction on the felony murder charge unless the state chooses to retry him within 180 days from the date of this ruling.

SO ORDERED.